DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, the City of Akron (the "City"), appeals the decision of the Summit County Court of Common Pleas, which entered judgment in favor of appellee, Gerald Williams ("Williams"), in the amount of $1,720,000. This Court reverses.
 I. {¶ 2} On the night of March 22, 1997, Pamela Williams ("Pamela") was home sleeping on the couch. She was awakened by her husband, Gerald Williams, an off-duty police officer for the City. Williams believed that Pamela had been unfaithful and the two got into an argument. Williams hit Pamela in the head. Pamela went into the kitchen and called 9-1-1 and reported that Williams had hit her. Williams followed Pamela into the kitchen, struggled with her over the phone and hit her once or twice in the face, rendering her unconscious. Pamela collapsed on the kitchen floor. Williams then left the house, leaving Pamela on the kitchen floor. When the police arrived, they arranged for Pamela to be taken to St. Thomas Hospital, where she underwent surgery for a broken jaw. Pamela spent three days in the hospital and her jaws were wired shut for six weeks.
 {¶ 3} Williams was charged with domestic violence. He pled to aggravated menacing and was ordered into the City's Time Out program. Following Williams' plea, Police Chief Irvine ordered The Internal Affairs Division ("IA") of the Akron Police Department to conduct its own investigation of the incident. Both Williams and Pamela lied to the IA investigators. They told investigators that Pamela had grabbed Williams' genitalia, and that he had struck her in self-defense. As he was being interviewed by the IA investigators, however, Williams admitted that he lied and told the investigators what really happened on the night the incident occurred.
 {¶ 4} Matt Contessa, the Deputy Mayor for Labor Relations, recommended that Mayor Plusquellic discharge Williams. Mayor Plusquellic followed the Office of Labor Relations' recommendation and discharged Williams. Williams appealed his dismissal to the Civil Service Commission. The Civil Service Commission upheld Williams' dismissal.
 {¶ 5} Williams then filed the underlying action in this appeal on November 23, 1999, claiming that he had been discharged because he is an African-American in violation of R.C. 4112.02. The matter proceeded to trial by a jury. At the close of Williams' case, the City moved for a directed verdict, which the trial court denied. The City renewed its motion for a directed verdict at the close of all evidence, and it was again denied by the trial court. The jury found in favor of Williams and awarded him $1.72 million. Following the jury's verdict, the City moved for judgment notwithstanding the verdict, for a new trial, or for a remittitur. The trial court denied the City's post-trial motions.
 {¶ 6} The City timely appealed to this Court, setting forth seven assignments of error for review. Williams filed a cross-appeal, asserting one assignment of error. This Court will first address appellant's appeal.
 II. FIRST ASSIGNMENT OF ERROR
"The trial court incorrectly denied the city's motion for a directed verdict at the close of plaintiff's case."
 {¶ 7} In its first assignment of error, the City argues that the trial court erred by not granting its motion for a directed verdict at the close of Williams' case. This Court agrees.
 {¶ 8} Whether a trial court properly granted or denied a motion for a directed verdict presents a question of law, which we review de novo.Schafer v. RMS Realty (2000), 138 Ohio App.3d 244, 257, appeal not allowed (2000), 90 Ohio St.3d 1472. Civ.R. 50(A)(4) provides:
"When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."
 {¶ 9} A motion for a directed verdict tests the sufficiency of the evidence, not the weight of the evidence or the credibility of witnesses. Wagner v. Roche Laboratories (1996), 77 Ohio St.3d 116, 119. Where there is substantial evidence upon which reasonable minds may reach different conclusions, the motion must be denied. Posin v. A.B.C. MotorCourt Hotel, Inc. (1976), 45 Ohio St.2d 271, 275. However, when the party opposing the motion has failed to produce any evidence on one or more of the essential elements of a claim, a directed verdict is appropriate.Hargrove v. Tanner (1990), 66 Ohio App.3d 693, 695.
 {¶ 10} R.C. 4112.02 prohibits an employer "because of the race, * * * [or] sex * * * of any person * * * to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." For a violation of the above, R.C. 4112.99 provides a remedy of "damages, injunctive relief, or any other appropriate relief."
 {¶ 11} To establish a prima facie case of discrimination, a plaintiff must show (1) membership in a protected class; (2) qualification for the position; (3) an adverse employment action; and (4) replacement by a non-protected person. McDonnell Douglas Corp. v. Green (1973),411 U.S. 792, 802, 36 L.Ed.2d 668. "[A] plaintiff can also make out aprima facie case by showing, in addition to the first three elements, that `a comparable non-protected person was treated better.'" (Emphasis sic.) Mitchell v. Toledo Hospital (C.A. 6, 1992), 964 F.2d 577, 582. See, also, Talley v. Bravo Pitino Rest., Ltd. (C.A. 6, 1995), 61 F.3d 1241,1246-1247. When using the comparable non-protected person was treated better element, a plaintiff "must produce evidence which at a minimum establishes (1) that he was a member of a protected class and (2) that for the same or similar conduct he was treated differently than similarly-situated non-minority employees." Mitchell,964 F.2d at 582-583. The parties to be compared must be similarly-situated in all respects, that is they "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Id. at 583. In Talley, the Sixth Circuit held: "showing that similarly situated non-protected employees were treated more favorably than the plaintiff is not a requirement but rather an alternative to satisfying the fourth element of the prima facie case [.]" Id. at 1247. "Thus, discrimination can be shown either by replacement by a non-protected person or by favorable treatment to comparable persons similarly-situated." Howell v. Summit County, 9th Dist. No. 20958, 2002-Ohio-5257, at ¶ 15.
 {¶ 12} In the present case, Williams did not offer evidence that he was replaced by a person outside of the protected classification. Therefore, in order to establish a prima face case of discrimination, he must show that he was treated differently than similarly situated employees from outside the class. Howell at ¶ 15.
 {¶ 13} The Six Circuit discussed what it means to be "similarly situated" in Clayton v. Meijer, Inc. (C.A. 6, 2002), 281 F.3d 605:
"As this Court first explained in Mitchell, `it is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly situated in all respects.' 964 F.2d at 583 (emphasis in original). As further explained in Ercegovich, `the plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered" similarly-situated;" rather . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in "all of the relevant aspects."' 154 F.3d at 352 (emphasis in original) (citation omitted). Finally, in Perry, we explained that `this Court has asserted that in applying the standard [that plaintiff must show that he is treated differently than similarly situated employees from outside the class] courts should not demand exact correlation, but should instead seek relevant similarity.' 209 F.3d at 601.
"* * *
"It is well established that Clayton may obtain relief under Title VII, even if he engaged in serious misconduct, provided that white employees who engage in the same conduct were either not disciplined or not disciplined as severely. McDonnell Douglas, 411 U.S. at 804 (in which the plaintiff, an African-American, engaged in an unlawful traffic obstruction at the employer's location, but was treated more severely than white employees engaging in the same conduct). As further explained in McDonald v. Santa Fe Transp. Co., 427 U.S. 273, 49 L.Ed.2d 493,96 S.Ct. 2574 (1976), `the ultimate . . . question as we indicated inMcDonald Douglas, [is whether] an allegation that "other employees involved in acts against (the employer) of comparable seriousness . . . were nevertheless retained. . . ."' Id. at 283 n. 11 (emphasis in original).
"* * *
"In this case, the employer discharged an African-American employee who had engaged in a serious act of misconduct which resulted in injury to a coworker who was rendered totally disabled. While other white employees may have engaged in the same acts of negligence, the employer is not precluded from considering the harm resulting from the conduct of its employees. In this case, only Clayton's negligence caused serious injury to a coworker. This is precisely `such differentiating or mitigating circumstance' that distinguishes Clayton's conduct from those of the three white coworkers. Mitchell, 964 F.2d at 583. * * * The fact that an employer discharged an African-American employee who seriously injured a coworker, but did not discharge white employees who engaged in the same conduct without injury to fellow employees, does not give rise to an inference of discrimination. In this case, the injuries to the coworker were serious and disabling." Id. at 610-612.
 {¶ 14} In Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248,253, 67 L.Ed.2d 207, the United States Supreme Court observed that "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff" and that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." "The prima facie case merely serves to raise a rebuttable presumption of discrimination by `eliminating the most common nondiscriminatory reasons for the [employer's treatment of the plaintiff],' and not to satisfy the plaintiff's ultimate burden of persuasion." (Citation omitted.) Hollinsv. Atlantic Co., Inc. (C.A. 6, 1999), 188 F.3d 652, 659. Therefore, in the case sub judice, the burden was on Williams to prove a prima facie case of race discrimination.
 {¶ 15} Williams established the first three prongs of the analysis set forth in McDonnell Douglas. Williams is a member of a protected class. He was discharged from his position as a police officer. He was qualified for the position of police officer. However, Williams failed to satisfy the fourth prong of the McDonnell Douglas analysis in that he did not establish that he was either replaced by a person from outside the protected class or was treated differently from similarly situated employees outside the protected class.
 {¶ 16} Williams offered seven white officers employed by the Akron Police Department as "comparables" — Michael Beitko, Mark Hockman, Michael Lugenbeal, Anna Starvaggi, Rick Warren, David Ferrell, and Robert Bennett.[1] This Court will discuss each officer separately and in no particular order.
 {¶ 17} Officer Anna Starvaggi was charged with conduct unbecoming. She had secondary employment as a security guard at Central-Hower High School. Officer Starvaggi called off sick three separate times at Central Hower. Two of those three occasions, she attended training sessions at the police department. Officer Starvaggi also entered incorrect information on her police log sheet in relation to a call. She was disciplined informally by Captain Callahan and Major Livers of the Akron Police Department.
 {¶ 18} Officer Starvaggi was clearly not a "comparable" to Williams. She was not similarly situated to Williams in any aspect. The conduct engaged in by Officer Starvaggi — calling off sick to a secondary job to work her primary job and entering incorrect information on a police log sheet — are in no way comparable to Williams' act of domestic violence.
 {¶ 19} In 1999, Officer Rick Warren was charged with conduct unbecoming for discharging a firearm at the FOP Lodge and failing to report the incident. Officer Warren was disciplined in-house by Chief Matulavich. In 2001, Officer Warren was disciplined for submitting overtime time sheets for work he did not perform. Officer Warren entered into an agreement with Chief Matulavich and Deputy Mayor Holland in which he was permanently demoted from Sergeant, received a 60-day suspension, and was barred from all off-duty extra jobs for one year.
 {¶ 20} Again, Officer Warren was clearly not a "comparable" to Williams. Discharging a firearm and domestic violence are not similar conduct. Neither is submitting an incorrect time sheet and domestic violence.
 {¶ 21} In 1995, Officer David Ferrell attempted to receive pay twice for the same hours. Officer Ferrell was disciplined informally by Captain Mullins. In 1997, he signed two different checks in two different names to avoid reporting the income to the Internal Revenue Service. The Internal Revenue Service refused to take the case, so the matter was handled internally. Officer Ferrell was charged with conduct unbecoming.
 {¶ 22} Once again, this Court must find that Officer Ferrell is not a "comparable" to Williams. Although serious behavior, neither turning in incorrect time sheets nor forgery is similar conduct to domestic violence.
 {¶ 23} In 1995, then Sergeant Robert Bennett was disciplined for conducting an improper search. Sergeant Bennett was disciplined informally. He was demoted for the rest of his career and suspended for 90 calendar days.
 {¶ 24} Although conducting an illegal search of someone's property is a serious matter, it is not by definition similar conduct to domestic violence. Therefore, Officer Bennett is not a "comparable" to Williams.
 {¶ 25} Officer Michael Lugenbeal was arrested when he and his wife began arguing at their home and he threw a hand-held can opener at her. He also threw a set of keys at her, but did not hit her then either. Mrs. Lugenbeal sustained no injuries as a result of the incident. Officer Lugenbeal pled to disorderly conduct. He was disciplined informally and received a five-day suspension.
 {¶ 26} Although, Officer Lugenbeal did engage in domestic violence as did Williams, the victim, Mrs. Lugenbeal, sustained no injuries. Mrs. Williams, however, was rendered unconscious, spent three days in the hospital, and had to have her jaws wired shut for several weeks. Given the severity of Mrs. Williams' injuries and Mrs. Lugenbeal's lack of injuries, this Court finds that Williams failed to demonstrate that he was similarly situated in all relevant aspects to Officer Lugenbeal.Ercegovich v. Goodyear Tire Rubber Co., (C.A. 6, 1998), 154 F.3d 344,353. Consequently, Officer Lugenbeal is not a "comparable" to Williams.
 {¶ 27} Officer Mark Hockman was charged with domestic violence as a result of an incident that occurred between him and his wife at their home. Before the trial began, Officer Hockman entered the domestic court's diversion program. Officer Hockman was formally disciplined. Mayor Plusquellic suspended Officer Hockman indefinitely. The victim, Mrs. Hockman, scraped the back of her legs, had a slight redness on her arm, and what appeared to be a bite mark on her nose. Mrs. Hockman drove herself to the hospital where she was treated and released.
 {¶ 28} While Officer Hockman did engage in domestic violence, this Court finds that Mrs. Hockman's and Mrs. Williams' injuries are not similar enough to conclude that Officer Hockman and Williams were similarly situated in all relevant aspects. Therefore, Officer Hockman is not a "comparable" to Williams.
 {¶ 29} Officer Michael Beitko was also disciplined as a result of an incident that occurred between him and his wife at their home. Lieutenant Sylvia Trundle of the Akron Police Department testified that neither she nor Lori Floren, Executive Director of Victim's Assistance observed any marks or bruising on Mrs. Beitko. Lieutenant Trundle also testified that Mrs. Beitko said that she was not injured. However, one officer did testify that she saw a slight red mark on Mrs. Beitko's neck. Given the severity of Mrs. Williams' injuries and Mrs. Beitko's lack of injuries, this Court finds that Williams failed to demonstrate that he was similarly situated in all relevant aspects to Officer Beitko.
 {¶ 30} While the officers that Williams offered as "comparables" may not be exemplary officers, this Court finds that Williams did not satisfy the fourth prong of the analysis set forth in McDonnell Douglas
and, therefore, has failed to establish a prima facie case of discrimination.
 {¶ 31} Consequently, after construing the evidence most strongly in favor of Williams, this Court finds that reasonable minds could come but to one conclusion, and that conclusion is that Williams failed to establish a prima facie case of discrimination. Civ.R. 50(A)(4). The City's first assignment of error is sustained.
 SECOND ASSIGNMENT OF ERROR
"The trial court erred in denying the city's motion for directed verdict at the close of all evidence and erred by denying the city's motion for judgment notwithstanding the verdict."
 THIRD ASSIGNMENT OF ERROR
"The verdict rendered by the jury is against the manifest weight of the evidence."
 FOURTH ASSIGNMENT OF ERROR
"The trial court erred in denying the city's motion for new trial and for remittitur."
 FIFTH ASSIGNMENT OF ERROR
"The trial court erred in failing to enforce the $250,000 statutory cap on compensatory damages in ohio revised code 2744.05(c)(1)."
 SIXTH ASSIGNMENT OF ERROR
"The trial court erred in not instructing the jury properly on the definition of similarly situated and failing to instruct the jury on the dispilinary process in the City of Akron Police Department."
 SEVENTH ASSIGNMENT OF ERROR
"The trial court abused its discretion in allowing plaintiff's attorney to read from a newspaper article previously ruled inadmissible."
 {¶ 32} This Court's disposition of the City's first assignment of error renders its remaining assignments of error moot; therefore, this Court declines to address them. See App.R. 12(A)(1)(c).
 CROSS-APPEAL CROSS-ASSIGNMENT OF ERROR
"The trial court erred by denying williams' motion for prejudgment interest outright without granting a hearing on the issue."
 {¶ 33} Williams' cross-assignment of error is also rendered moot by this Court's disposition of the City's first assignment of error. Therefore, this Court will not address it. See App.R. 12(A)(1)(c).
 III. {¶ 34} The City's first assignment of error is sustained. This Court declines to review the remaining assignments of error. Williams' cross-assignment of error is moot. The judgment of the trial court is reversed and judgment is entered in favor of the City.
Judgment reversed.
Slaby, P.J., Whitmore, J. concur.
[1] Evidence of the discipline of black officers was also presented at trial by the City. These employees will not be discussed as they were not presented in support of plaintiff's prima facie case. However, it is interesting to note that black officers were involved in domestic violence incidents and not discharged.