DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Carol Lindsay, M.D., appeals the judgment of the Summit County Court of Common Pleas, which granted summary judgment against her in favor of Appellees, Children's Hospital Medical Center of Akron ("Children's") and Justin Lavin, M.D. This Court affirms, in part, and reverses, in part.
 I. {¶ 2} Children's created a Maternal Fetal Medicine Department ("MFMD") in 2004, when it purchased the private practice of two local perinatologists, Drs. Lavin and Steven Crane. The plan was to staff the MFMD with five full-time perinatologists, including Drs. Lavin and Crane, who would see patients at Akron General Medical Center (" AG"), Summa Health System ("Summa"), and various outlying high risk outpatient clinics. Dr. Lindsay was the third perinatologist hired, although she insisted upon working only part-time. Dr. Lavin, the chairman of the department, ultimately agreed to hire Dr. Lindsay within a part-time capacity. Children's *Page 2 
and Dr. Lindsay executed a five-year contract for her part-time employment which commenced on June 20, 2005. Dr. Christos Hatjis was subsequently hired by the MFMD, and he assumed the position of vice chairman of the department. Children's continued to work with recruitment firms, seeking other perinatologists for the department. By a letter dated May 1, 2006, Children's terminated Dr. Lindsay's employment, effective May 5, 2006.
 {¶ 3} On June 27, 2006, Dr. Lindsay filed a complaint against Children's and Dr. Lavin, alleging one count of breach of contract, one count each of racial and gender discrimination pursuant to R.C. Chapter 4112, one count of retaliation pursuant to R.C. Chapter 4112, and one count of wrongful termination in violation of public policy. The defendants filed an answer. On May 23, 2007, Dr. Lindsay moved for leave to file an amended complaint, which the trial court granted. In her amended complaint, Dr. Lindsay alleged a second count of retaliation. The defendants filed an answer.
 {¶ 4} On October 29, 2007, Children's and Dr. Lavin filed a joint motion for summary judgment. Dr. Lindsay filed a memorandum in opposition, and the defendants replied. On January 2, 2008, the defendants filed a notice of supplemental authority in support of their motion for summary judgment in regard to the count alleging wrongful termination in violation of public policy. On February 8, 2008, the trial court granted the defendants' motion for summary judgment on all counts in favor of Children's and Dr. Lavin and against Dr. Lindsay. Dr. Lindsay timely appealed, raising three assignments of error. This Court consolidates the assignments of error for ease of discussion.
 II. ASSIGNMENT OF ERROR I "THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR THE APPELLEES ON THE APPELLANT'S RETALIATION CLAIM AS THE *Page 3 
APPELLANT ESTABLISHED A PRIMA FACIE CASE OF RETALIATION AND ESTABLISHED GENUINE ISSUES OF MATERIAL FACT CONCERNING THE APPELLEES' REASONS FOR TERMINATING THE APPELLANT AND SENDING DISPARAGING LETTERS TO PROSPECTIVE EMPLOYERS."
 ASSIGNMENT OF ERROR II "THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR THE APPELLEES ON THE APPELLANT'S SEX AND RACE DISCRIMINATION CLAIMS, AS THE APPELLANT ESTABLISHED A PRIMA FACIE CASE OF SEX AND RACE DISCRIMINATION AND ESTABLISHED GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER THE APPELLEES' ARTICULATED REASONS FOR TERMINATING THE APPELLANT WERE A PRETEXT FOR DISCRIMINATION."
 ASSIGNMENT OF ERROR III "THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR THE APPELLEES ON THE APPELLANT'S BREACH OF CONTRACT CLAIM, AS THE APPELLANT ESTABLISHED, AS A MATTER OF LAW, THAT THE APPELLEES DID NOT GIVE REQUIRED NOTICE OF THE INTENT TO TERMINATE THE EMPLOYMENT AGREEMENT, AND THE APPELLANT ESTABLISHED GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER THE ARTICULATED REASONS FOR TERMINATING THE EMPLOYMENT AGREEMENT CONSTITUTED `JUST CAUSE.'"
 {¶ 5} Dr. Lindsay argues that the trial court erred by granting summary judgment in favor of Children's and Dr. Lavin on her claims for retaliation, gender and racial discrimination, and breach of contract. This Court agrees, in part, and disagrees, in part.
 {¶ 6} This Court reviews an award of summary judgment de novo.Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105. This Court applies the same standard as the trial court, viewing the facts in the case in the light most favorable to the non-moving party and resolving any doubt in favor of the non-moving party. Viock v. Stowe-WoodwardCo. (1983), 13 Ohio App.3d 7, 12.
 {¶ 7} Pursuant to Civ. R. 56(C), summary judgment is proper if:
 "(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from *Page 4 
the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 327.
 {¶ 8} To prevail on a motion for summary judgment, the party moving for summary judgment must be able to point to evidentiary materials that show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Dresher v.Burt (1996), 75 Ohio St.3d 280, 293. Once a moving party satisfies its burden of supporting its motion for summary judgment with sufficient and acceptable evidence pursuant to Civ. R. 56(C), Civ. R. 56(E) provides that the non-moving party may not rest upon the mere allegations or denials of the moving party's pleadings. Rather, the non-moving party has a reciprocal burden of responding by setting forth specific facts, demonstrating that a "genuine triable issue" exists to be litigated for trial. State ex rel. Zimmerman v. Tompkins (1996), 75 Ohio St.3d 447,449.
Retaliation {¶ 9} Dr. Lindsay alleged in her amended complaint that the defendants retaliated against her in violation of R.C. Chapter 4112 for engaging in protected activity: (1) by threatening to terminate her, by attempting to force her to resign and by terminating her employment; and (2) by disparaging her to potential new employers and interfering with her efforts to obtain new employment.
 {¶ 10} R.C. 4112.02(I) prohibits retaliation and states:
 "It shall be an unlawful discriminatory practice *** [f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code." *Page 5 
 {¶ 11} The state courts may look to federal case law regarding cases involving alleged violations of R.C. Chapter 4112. Varner v. TheGoodyear Tire Rubber Co., 9th Dist. No. 21901, 2004-Ohio-4946, at ¶ 10, citing Plumbers Steamfitters Joint Apprenticeship Commt. v. OhioCiv. Rights Comm. (1981), 66 Ohio St.2d 192, 196.
 {¶ 12} To establish a prima facie case of retaliation, Dr. Lindsay must demonstrate:
 "(1) that she engaged in protected activity; (2) that the employer knew of her exercise of protected rights; (3) that she was the subject of adverse employment action; and (4) that there is a causal link between the protected activity and the adverse employment action." Price v. Matco Tools, 9th Dist. No. 23583, 2007-Ohio-5116, at ¶ 38, citing Balmer v. HCA, Inc. (C.A.6, 2005), 423 F.3d 606, 614.
The United States Supreme Court recently held that "the anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace."Burlington Northern and Santa Fe Ry. Co. v. White (2006), 548 U.S. 53,57.
 {¶ 13} This Court has stated:
 "With respect to the final element, a plaintiff must produce evidence which permits the inference that apart from the protected activity, the adverse action would not have been taken. Nguyen v. Cleveland (C.A.6, 2000), 229 F.3d 559, 563. This determination is made with reference to the surrounding circumstances, including `evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiffs exercise of protected rights[.]' Id. Standing alone, however, temporal proximity does not establish the requisite connection, and this is particularly true when the evidence demonstrates intervening performance concerns. Id. at 566-67, citing Cooper v. North Olmsted (C.A.6, 1986), 795 F.2d 1265, 1272[.]" Price at ¶ 39.
 {¶ 14} If Dr. Lindsay establishes a prima facie case of retaliation, the burden then shifts to the defendants "to articulate a legitimate reason for its action." Bennett v. Roadway Express, Inc. (Aug. 1, 2001), 9th Dist. No. 20317, quoting Chandler v. Empire Chem., Inc., MidwestRubber Custom Mixing Div. (1994), 99 Ohio App.3d 396, 402. "If that burden is met, the burden then shifts back to the plaintiff `to show that the articulated reason was merely a pretext.'" Bennett, supra, quoting Chandler, 99 Ohio App.3d at 402. This Court has further recognized: *Page 6 
 "[A] reason cannot be proved to be `a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." Bennett, supra, quoting St. Mary's Honor Ctr. v. Hicks (1993), 509 U.S. 502, 515.
 {¶ 15} Dr. Lindsay first claims that the defendants attempted to and ultimately terminated her because she engaged in protected activities, specifically, because she raised allegations of discrimination in an April 18, 2006 letter to Dr. Lavin, and copied to Candace Zalick, MFMD Practice Manager, and Ruth Swan, Director of Human Resources at Children's; and because she filed a charge of discrimination and retaliation on April 27, 2006, with the Ohio Civil Rights Commission.
 {¶ 16} In an effort to meet their initial burden underDresher, the defendants presented the following evidence in support of their argument that they were unaware of Dr. Lindsay's exercise of protected rights. Dr. Lavin testified that the first serious issue regarding Dr. Lindsay's performance occurred in September 2005 when he learned that she had in excess of 50 incomplete ultrasound reports at Summa. He testified that he began keeping notes on her performance issues after that time. Dr. Lindsay acknowledged during her deposition that Dr. Lavin discussed performance issues with her in September or October 2005 and again in November 2005 at a meeting with Practice Manager Candace Zalick. Dr. Lavin testified that he shared his notes regarding Dr. Lindsay with the hospital's attorney in February or March 2006.
 {¶ 17} Dr. Lindsay admitted during her deposition that she attended a meeting on April 5, 2006, with Dr. Lavin and Lisa Aurilio, Children's Director of Maternal-Fetal-Neonatal Services, at which time Dr. Lavin vaguely brought up numerous performance issues. Dr. Lindsay admitted that she received a copy of a letter to her from Dr. Lavin, dated April 5, 2006, by the end of that meeting. The letter enunciates eleven specific "areas that require continued *Page 7 
performance improvement." The last paragraph of the letter reads: "This letter will inform you that your performance in these areas must show marked improvement. This letter should be considered notification of your one year prior written notice for termination of your contact [sic] unless marked improvement is noted in your performance. The period of notice may be reduced to 30 days if there is not marked improvement in your performance."
 {¶ 18} Dr. Lavin testified that he experienced much frustration regarding scheduling for Dr. Lindsay because of her part-time status and the fact that Dr. Lindsay notified him of many days she was unavailable to work. He testified that days off were granted on a first come-first served basis. Because two of the four perinatologists had requested and received approval for time off on April 21, 2006, Dr. Lavin denied Dr. Lindsay's subsequent request for that day off. In an email dated April 11, 2006, Dr. Lindsay asserted that she would not be available to work on April 21, 2006. Dr. Lavin testified that, immediately thereafter, he met with administration and told them, "this is it; after all our discussions about past safety and whatnot, if she doesn't come in, then we have to terminate her." He testified that administration prepared a letter to that effect on April 17, 2006. Grace Wakulchik, Vice President of Patient Services, testified that the final decision to terminate was made in collaboration with hospital attorneys and human resources when they learned that Dr. Lindsay would not show up for work on April 21, 2006. By such evidence, the defendants met their initialDresher burden.
 {¶ 19} Dr. Lindsay wrote a letter to Dr. Lavin, dated April 18, 2006, and not received by him until April 19, 2006, alleging discrimination. Because the decision to terminate Dr. Lindsay had already been made by April 17, 2006, when a termination letter was first drafted, Dr. Lindsay failed to meet her reciprocal burden under Tompkins to present evidence that the defendants knew of her exercise of protected rights. *Page 8 
 {¶ 20} Further, because the decision to terminate her had already been made by April 17, 2006, there is no causal link between her April 27, 2006 filing of her complaint with the Ohio Civil Rights Commission and her ultimate termination on May 5, 2006. "Employers need not suspend previously contemplated employment actions upon learning of protected activity by the employee." Warren v. Ohio Dept. of Pub. Safety (C.A.6, 2001), 24 Fed.Appx. 259, 266. In support of their initial burden, the defendants presented evidence that they contemplated Dr. Lindsay's imminent termination based on her long-term performance issues as early as April 11, 2006, when Dr. Lindsay asserted she would not report for work as scheduled on April 21, 2006. Having given what they believed to be the requisite 30-day notice for termination for cause on April 5, 2006, the defendants were not prohibited from terminating Dr. Lindsay effective May 5, 2006, merely because she engaged in protected activity, i.e., the April 27, 2006 complaint, in the interim. Under the circumstances, Dr. Lindsay failed to present evidence of any causal connection between her protected activity and her termination.
 {¶ 21} Assuming, arguendo, that she made her prima facie case, the defendants have again met their Dresher burden by articulating numerous legitimate business reasons for her termination. Dr. Lavin, Ruth Swan, Candace Zalick and Lisa Aurilio all testified that they became aware of numerous, on-going performance issues regarding Dr. Lindsay. Dr. Lavin's notes regarding Dr. Lindsay chronicled the following performance issues based on his good faith belief and reports from others: September 2005: more than 50 incomplete ultrasound reports; failure to sign AG clinic contract; inaccurate billing slips due to their untimely completion and problems remembering services provided; not available within a reasonable time to respond to patients in labor; suspension from AG for failure to complete records; failure to respond to critical transfer patient; October 2005: not available to respond to emergencies in labor in a *Page 9 
timely manner; November 2005: failure to come to hospital when called by residents regarding a patient undergoing a therapeutic termination; made an obscene gesture toward an ultrasound technician after the technician informed her that a patient was upset after waiting 50 minutes; demeaned the head nurse for testing in front of medical students; brought her daughter to work which brought chaos to the office; failure to sign dictation; failure to sign additional ultrasound charts/reports; and maintaining an office "which was one of the worse [sic] messes I have ever seen and certainly not appropriate for a professional office." Dr. Lavin's notes indicate that he met with Dr. Lindsay on November 30, 2005, and discussed the "very serious situation." His notes include two pages of concerns and Dr. Lindsay's responses.
 {¶ 22} Dr. Lavin's notes chronicled further issues: February 2006: confrontation over patient care between Dr. Lindsay, Dr. Crane and Nurse Marty LaConte concluding in determination that Dr. Lindsay provided inappropriate clinical care to a patient experiencing decelerations; Dr. Lindsay's abandonment of a patient during labor and nearing delivery (patient "pushing"); late for diabetic clinic and disrespectful remarks to the perinatal clinical specialist and patients; confrontational and nonreceptive attitude to Dr. Lavin's suggestions; disrespectful to perinatal nurses; failure to timely complete ultrasound report and notify a referring doctor regarding a serious complication with a patient; March 2006: failure to sign non-stress tests over entire weekend when Dr. Lindsay was on call; second suspension of privileges for failure to sign charts at AG; April 2006: meeting with Dr. Lindsay to discuss 11 on-going performance issues requiring improvement and notifying her of termination in one year; failure to participate in mandatory PLATO training (for records); April 11, 2006 email from Dr. Lindsay that she would not work on April 21, 2006, as scheduled; failure by Dr. Lindsay to work as scheduled on April 21, 2006, necessitating that Dr. Lavin cover rounds at 2 hospitals, manage patients at 2 hospitals, *Page 10 
cancel some patients due to lack of a second physician, miss 2 meetings in violation of contract so he could manage patients, and sign Dr. Lindsay's late dictations.
 {¶ 23} A review of the record indicates that the defendants presented evidence of articulated legitimate reasons for Dr. Lindsay's termination, by way of long-standing and unresolved performance issues. Dr. Lindsay, however, has failed to meet her reciprocal burden to present any evidence to show that such reasons were false and, therefore, merely pretext for termination in retaliation for her participation in protected activity. Accordingly, the trial court did not err by granting summary judgment in favor of the defendants on Count IV of Dr. Lindsay's amended complaint.
 {¶ 24} Dr. Lindsay next claims that the defendants retaliated against her by disparaging her to potential new employers and interfering with her efforts to obtain new employment after she filed the instant lawsuit. Summary judgment in favor of the defendants was appropriate because Dr. Lindsay failed to meet her reciprocal burden by demonstrating the existence of a causal connection between the protected activity and the adverse employment action.
 {¶ 25} On September 1, 2006, Dr. Lavin sent letters to two prospective employers, where Dr. Lindsay was seeking to obtain employment. Dr. Lavin sent a letter to Weatherby Locums, Inc. "in lieu of the professional reference form sent" and to Eastern Maine Medical Center "in lieu of the verification of hospital affiliation form sent[.]" The two letters were otherwise identical. The letters identified Dr. Lindsay's responsibilities in the MFMD at Children's, noted her medical knowledge within the specialty as adequate, and asserted that she is "an ethical clinician and generally has good medical patient management and communication skills." The letters further identified good performance areas and areas in which Dr. Lindsay's performance was lacking. Dr. Lavin recommended that the prospective employers speak with Dr. Lindsay *Page 11 
about those issues to get her perspective. Finally, Dr. Lavin opined that "Dr. Lindsay could continue her career as a perinatologist in a setting where peers are available for mentoring."
 {¶ 26} The defendants argued in their motion for summary judgment that Dr. Lindsay "can submit no evidence showing that any prospective employer did not hire her because of the alleged negative comments." Dr. Lindsay argued in her opposition to the motion for summary judgment that Eastern Maine Medical Center "suddenly asked [her] to withdraw her application for privileges." She further argued that the Weatherby recruiter suddenly stopped communicating with her after almost daily communication during the summer of 2006. Although Dr. Lindsay cites to pages 438-39 of her deposition in support of her statements, those pages are not contained in the record.
 {¶ 27} "Where *** there is no admissible evidence that the statements of the former employer caused or contributed to the rejection by the prospective employer, the plaintiff has failed to present a prima facie case." Sarno v. Douglas Elliman-Gibbons Ives, Inc. (C.A.2, 1999),183 F.3d 155, 160. As in Sarno, Dr. Lindsay failed to present an affidavit or other sworn testimony from either prospective employer attributing their decisions to discontinue contact with her to Dr. Lavin's letters to them. See id. Without any such sworn statements from the prospective employers, Dr. Lindsay has failed to meet her reciprocal burden and "failed to adduce any evidence sufficient to create a genuine issue to be tried as to [her] contention that [Dr. Lavin's letters] to [prospective employers] caused [the prospective employers] not to hire [her] and hence was an adverse employment action." See id. Because Dr. Lindsay failed to demonstrate her prima facie case of retaliation as alleged in Count V of her amended complaint, the trial court did not err by granting summary judgment in favor of the defendants on that claim. Dr. Lindsay's first assignment of error is overruled. *Page 12 
Gender and Racial Discrimination {¶ 28} Dr. Lindsay alleged that the defendants discriminated against her on the basis of her gender and race in violation of R.C. 4112.02
with respect to the terms and conditions of her employment and by considering her gender and race as motivating factors in their decision to terminate her employment.
 {¶ 29} R.C. 4112.02 provides in relevant part:
"It shall be an unlawful discriminatory practice:
 "(A) For any employer, because of the race, *** [or] sex *** of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."
The Ohio Supreme Court has stated that "federal case law interpreting Title VII of the Civil Rights Act of 1964 *** is generally applicable to cases involving alleged violations of R.C. Chapter 4112." Plumbers Steamfitters Joint Apprenticeship Commt., 66 Ohio St.2d at 196. Therefore, this Court may look to federal case law in addition to state law to determine resolution of this matter.
 {¶ 30} This Court has stated:
 "To establish a prima facie case of discrimination, a plaintiff must show: (1) membership in a protected class; (2) qualification for the position; (3) an adverse employment action; and (4) replacement by a non-protected person. McDonnell Douglas Corp. v. Green (1973), 411 U.S. 792, 802. `[A] plaintiff can also make out a prima facie case by showing, in addition to the first three elements, that "a comparable non-protected person was treated better."' Mitchell v. Toledo Hosp. (C.A.6, 1992), 964 F.2d 577, 582. See, also, Talley v. Bravo Pitino Rest, Ltd. (C.A.6, 1995), 61 F.3d 1241, 1246-47. When using the comparable non-protected person was treated better element, a plaintiff `must produce evidence which at a minimum establishes (1) that he was a member of a protected class and (2) that for the same or similar conduct he was treated differently than similarly-situated non-minority employees.' Mitchell, 964 F.2d at 582-83. The parties to be compared must be similarly-situated in all respects, that is they `must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating *Page 13 
circumstances that would distinguish their conduct or the employer's treatment of them for it.' Id. at 583. In Talley, the Sixth Circuit held: `showing that similarly situated non-protected employees were treated more favorably than the plaintiff is not a requirement but rather an alternative to satisfying the fourth element of the prima facie case[.]' Talley, 61 F.3d at 1247. `Thus, discrimination can be shown either by replacement by a non-protected person or by favorable treatment to comparable persons similarly-situated.' Howell v. Summit Cty., 9th Dist. No. 20958, 2002-Ohio-5257, at ¶ 15. Finally, a plaintiff may show that he was the victim of a discriminatory practice by either direct evidence or through indirect evidence. Byrnes v. LCI Communications Holdings Co. (1996), 77 Ohio St.3d 125, 128." Atkinson v. Akron Bd. of Edn., 9th Dist. No. 22805, 2006-Ohio-1032, at ¶ 28.
 {¶ 31} Dr. Lindsay has not alleged discriminatory conduct based on direct evidence; rather, she argues on appeal that she was subjected to disparate treatment and, ultimately, termination, "while her similarly situated White male colleagues were not so much as counseled for identical or similar conduct."
 {¶ 32} In this case, there is no dispute that Dr. Lindsay, as an African-American female, is a member of a protected class. In addition, there is no dispute that she suffered an adverse employment action, specifically, that her employment was terminated.
 {¶ 33} When evaluating the qualification prong, the Sixth Circuit has clarified the relevant considerations, holding:
 "At the prima facie stage, a court should focus on a plaintiffs objective qualifications to determine whether he or she is qualified for the relevant job. See Aka v. Washington Hosp. Ctr. (D.C. Cir., 1998), 156 F.3d 1284, 1298 (en banc) (noting that `courts traditionally treat explanations that rely heavily on subjective considerations with caution,' and that `an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination'); MacDonald v. E. Wyo. Mental Health Ctr. (C.A.10, 1991), 941 F.2d 1115, 1121
(holding that a plaintiff can show that she is qualified by presenting `credible evidence that she continued to possess the objective qualifications she held when she was hired'). The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiffs education, experience in the relevant industry, and demonstrated possession of the required *Page 14 
general skills." (Emphasis omitted.) Wexler v. White's Fine Furniture, Inc. (C.A.6, 2003), 317 F.3d 564, 575-76.
 {¶ 34} Exhibit A to Dr. Lindsay's employment agreement set forth a 16-point job description, including, among other things, that she maintain an unrestricted license to practice medicine; maintain board certification in maternal-fetal medicine; maintain clinical privileges in good standing at Children's, AG, Summa, and all other hospitals where Children's perinatologists have privileges; cooperate in the timely completion of documents; and provide all reasonable medical services and support when called upon in an emergency situation. Dr. Lavin testified that he compiled notes regarding complaints he received regarding Dr. Lindsay's deficiencies, including her chronic failure to complete medical records which resulted in the suspension of her clinical privileges at AG and her failure to timely respond to emergencies when called. In addition, Dr. Lavin and Dr. Crane testified that they disagreed with Dr. Lindsay's clinical evaluation and treatment of a patient whose fetus evidenced deceleration in heart rate during monitoring.
 {¶ 35} Dr. Lindsay, however, presented her curriculum vitae, evidencing her education, experience and general qualifications as a perinatologist. Furthermore, Dr. Eric Jenison, Chairman of OB/GYN at AG, testified that suspensions up to 57 days constitute merely temporary suspensions and that suspensions terminate upon the completion of outstanding records. Dr. Jenison further testified that it is not unusual for physicians to receive temporary suspensions for delinquent medical records. He testified that, only if the suspension goes beyond 57 days does it become permanent, effecting a voluntary resignation by the physician and requiring reapplication for privileges. There is no evidence that Dr. Lindsay's privileges were ever permanently suspended. Regarding disagreements with Dr. Lindsay's clinical evaluations and treatments, Dr. Crane conceded during his deposition that different physicians have different *Page 15 
ways of doing things and that, as long as the conduct falls within the standard of care, a difference in practices is not problematic. Dr. Crane testified, however, that he believed that Dr. Lindsay's leaving a diabetic teenager in active labor, whose fetus was evidencing decelerations, fell below the standard of care.
 {¶ 36} Although there is some evidence that Dr. Lindsay was not subjectively qualified to work in Children's MFMD, there is evidence of her objective qualifications. Her education and experience indicate that she was qualified. Dr. Lavin, in letters to prospective employers seeking references for Dr. Lindsay, stated that Dr. Lindsay's "medical knowledge within the specialty is adequate." Accordingly, a genuine issue of material fact exists regarding whether she was qualified for the position.
 {¶ 37} After Dr. Lindsay's termination, Children's hired Dr. Angela Silber as a perinatologist member of the MFMD, first in a part-time capacity, and later full-time after Dr. Silber completed a fellowship. The addition of Dr. Silber to the department brought the number of perinatologists to four, and it is undisputed that the original plan was to staff the MFMD with at least five perinatologists. Under these circumstances, the evidence does not support a finding that Dr. Silber was hired as a replacement for Dr. Lindsay.
 {¶ 38} The remaining element of Dr. Lindsay's prima facie case is whether a comparable, non-protected person was treated better than she was. She must establish that she was treated differently than similarly-situated non-minority employees for the same or similar conduct. See Mitchell, 964 F.2d at 582-83. The threshold issue is whether there existed in the MFMD similarly-situated non-minority employees. "In practical terms, two employees are not similarly-situated in all relevant respects if there is a meaningful distinction between them which explains their employer's differential treatment of them."Poppy v. Willoughby Hills City *Page 16 Council, 11th Dist. No. 2004-L-015, 2005-Ohio-2071, at ¶ 41, citingErcegovich v. Goodyear Tire Rubber Co. (C.A.6, 1998), 154 F.3d, 344. The Sixth Circuit explained:
 "We explained in Mitchell [v. Toledo Hosp.
(C.A.6, 1992), 964 F.2d 577] that when the plaintiff lacks direct evidence of discrimination, `the plaintiff must show that the "comparables" are similarly-situated in all respects,' absent other circumstantial or statistical evidence supporting an inference of discrimination. Id. at 583. Although this statement appears to invite a comparison between the employment status of the plaintiff and other employees in every single aspect of their employment, Mitchell has not been so narrowly construed. In Pierce v. Commonwealth Life Ins. Co. (C.A.6, 1994), 40 F.3d 796, this court explained that the plaintiff was simply `required to prove that all of the relevant aspects of his employment situation were "nearly identical" to those of [the non-minority's] employment situation.' Id. at 802 (emphasis added); see also Holifield v. Reno (C.A.11, 1997), 115 F.3d 1555, 1562 (citing Mitchell in support of the proposition that `[t]o make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects' (emphasis added)); Neuren v. Adduci, Mastriani, Meeks Schill (C.A.D.C. 1995), 43 F.3d 1507, 1514 (quoting Pierce); Byrd v. Ronayne (C.A.1, 1995), 61 F.3d 1026, 1032 (`A disparate treatment claimant bears the burden of proving that she was subjected to different treatment than persons similarly situated in all relevant aspects.' (quotations omitted)). Mitchell itself only relied on those factors relevant to the factual context in which the Mitchell case arose — an allegedly discriminatory disciplinary action resulting in the termination of the plaintiff's employment. We held that to be deemed `similarly-situated' in the disciplinary context, `the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.' Mitchell, 964 F.2d at 583. These factors generally are all relevant considerations in cases alleging differential disciplinary action. Cf. Pierce, 40 F.3d at 802 (explaining that the distinction in supervisory status between plaintiff and non-minority employee also accused of sexual harassment was relevant because company's liability under Title VII for sexual harassment could depend on employee's status). Courts should not assume, however, that the specific factors discussed in Mitchell are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee. The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered `similarly-situated;' rather, as this court has held in Pierce, the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in `all of the relevant aspects.' Pierce, 40 F.3d at 802
(emphasis added). *Page 17 
 "A prima facie standard that requires the plaintiff to demonstrate that he or she was similarly-situated in every aspect to an employee outside the protected class receiving more favorable treatment removes from the protective reach of the antidiscrimination laws employees occupying `unique' positions, save in those rare cases where the plaintiff produces direct evidence of discrimination. As the plaintiff-appellant points out in his reply brief, if the non-protected employee to whom the plaintiff compares himself or herself must be identically situated to the plaintiff in every single aspect of their employment, a plaintiff whose job responsibilities are unique to his or her position will never successfully establish a prima facie case (absent direct evidence of discrimination). *** Thus, under the district court's narrow reading of Mitchell, an employer would be free to discriminate against those employees occupying `unique' positions. This circuit has never endorsed such a narrow construction of Mitchell. Rather, as explained above and as held previously by this court in Pierce, we simply require that the plaintiff demonstrate that he or she is similarly-situated to the non-protected employee in all relevant respects. A contrary approach would undermine the remedial purpose of the anti-discrimination statutes." (Emphasis in original.) Ercegovich, 154 F.3d at 352-53.
 {¶ 39} There is no evidence to indicate that the other three perinatologists in the MFMD, Drs. Lavin, Crane and Hatjis, were anything other than Caucasian males, i.e., non-protected employees.
 {¶ 40} The defendants argued in their motion for summary judgment that Dr. Lindsay was not similarly-situated to any of her male colleagues for six reasons: (1) Dr. Lindsay worked part-time, while the other three physicians worked full-time; (2) Drs. Lavin and Hatjis were officers, responsible for administrative/managerial duties for the MFMD, which duties Dr. Lindsay did not share; (3) Dr. Lindsay had less experience as a perinatologist (since 1999) than Dr. Crane (since 1995) and Dr. Hatjis (since 1983); (4) discrimination claims premised on status as a single parent is not actionable; (5) Dr. Lindsay was subject to a different (lower) productivity bonus scheme due to her part-time status; and (6) Dr. Lindsay's male colleagues did not demonstrate the same performance deficiencies (e.g., delayed completion of medical records, revocation of privileges, failure to show up for work as scheduled, abandonment of patients, and poor treatment of staff personnel). This Court agrees that single-parent status does not constitute *Page 18 
a protected class for purposes of anti-discrimination law and consequently does not further Dr. Lindsay's demonstration of a prima facie case.
 {¶ 41} There is no evidence that Dr. Lavin and Dr. Lindsay were similarly-situated. Dr. Lavin, as Chief of the MFMD, supervised Dr. Lindsay and coordinated with Grace Wakulchik, Vice President of Patient Services; Ruth Swan, Director of Human Resources at Children's; Lisa Aurilio, Director of Maternal-Fetal-Neonatal Services for Children's; and Candace Zalick, Practice Manager, regarding Dr. Lindsay's performance and professional conduct issues. Dr. Lavin counseled Dr. Lindsay regarding those issues, co-signed the letter giving her one year's notice of her termination, and signed the letter purporting to terminate her employment. Dr. Lavin and Dr. Lindsay did not have similar titles; did not report to the same supervisor; did not receive the same salary, even taking into consideration pro-rating based on Dr. Lindsay's part-time status; and did not possess the same level of responsibility. See Kroh v. Continental Gen. Tire, Inc. (2001), 92 Ohio St.3d 30, 31-2. Given these differences, the defendants presented evidence in support of their initial Dresher burden, while Dr. Lindsay failed to meet her reciprocal burden to demonstrate that she was similarly-situated in all relevant respects to Dr. Lavin. Ercegovich, 154 F.3d at 353.
 {¶ 42} Dr. Hatjis was the Vice Chair of the MFMD, and he testified to numerous specific tasks assigned to him. For example, he testified that, although some tasks listed in the Vice Chair's job description overlap with tasks shared to some extent by all the perinatologists, he personally was charged with (1) serving as the Director of Maternal Fetal Medicine at Summa, responsible for the implementation of the contract between Children's and Summa and interaction with the Chair of the MFMD and Summa's Chair of OB/GYN; (2) serving as Acting Chairman of the MFMD during the Chairman's absence or upon direction; (3) participating in *Page 19 
MFMD staff meetings; (4) participating in Summa Obstetrics Department faculty and staff meetings; (5) participating in administrative and leadership development programs within Children's; (6) working with the MFMD Chair and Administrative Director to ensure, improve and enhance clinical and administrative practice operations and efficiencies; (7) participating in (non-physician) staff performance evaluations in the MFMD service areas; and (8) coordinating with Dr. Lavin and other MFMD administrators to transition the MFMD leadership role at Summa from Dr. Lavin to Dr. Hatjis.
 {¶ 43} The defendants cite some authority for the proposition that an employee is not similarly-situated with another employee who has an administrative or managerial role. See, e.g., Lange v. Honda of AmericaMfg., Inc., 11th Dist. No. 14-03-49, 2004-Ohio-2060, at ¶ 13;Clevidence v. Wayne Sav. Community Bank (N.D.Ohio 2001),143 F.Supp.2d 901, 909. Dr. Lindsay cited Kroh, supra, in support of her argument that Dr. Hatjis' administrative and managerial duties did not significantly distinguish his position so that the two could not still be considered similarly-situated. In Kroh, the court determined that the plaintiff, the sole cash manager at General Tire, had presented evidence to show that she was similarly-situated to the male managers to whom she compared herself. Id. at 32. In that case, however, the evidence established that General Tire considered all the manager positions, specifically, the real estate manager, risk manager and cash manager, to be interchangeable. Id. at 31. In this case, Dr. Lindsay's position was not interchangeable with Dr. Hatjis' position due to his numerous additional duties and responsibilities.
 {¶ 44} The instant case is more analogous to the situation inClevidence. Dr. Lindsay testified that she was unable to complete her medical records, which ultimately led to two suspensions, because she was not scheduled at the main hospitals as often as the other *Page 20 
physicians. Dr. Lavin testified, however, that he spent approximately one-half of his time at AG and one-half of his time at Children's because he had administrative functions there. According to copies of physicians' schedules authenticated by Candace Zalick, who maintained them in the regular course of her duties as Practice Manager, Dr. Hatjis spent the majority of his time at Summa, where he had administrative duties. While both Dr. Lindsay and Dr. Hatjis performed maternal-fetal medicine clinical duties, Dr. Hatjis was also the Vice Chair of MFM at Summa. He was obligated to fulfill his administrative duties at Summa, necessitating his frequently scheduled presence there, just as Dr. Lavin was required, as Chair, to generally divide his time between Children's and AG. Dr. Lindsay points to no evidence in the record to show that Dr. Hatjis was never scheduled at the outlying clinics in Hudson and at the Considine Building, or that he was scheduled frequently at Summa for any reason other than to accommodate his administrative duties. Accordingly, while the defendants presented evidence to meet their initial burden, Dr. Lindsay failed to meet her reciprocal burden to demonstrate that she was similarly-situated in all relevant respects to Dr. Hatjis.Clevidence, 143 F.Supp.2d at 909; see, also, Ercegovich,154 F.3d at 353.
 {¶ 45} Finally, Dr. Lindsay has not demonstrated that she was similarly-situated to Dr. Crane. Dr. Lindsay could meet her burden if she could demonstrate that, although she evidenced serious performance issues and unprofessional conduct, Dr. Crane exhibited the same performance issues and unprofessional conduct, yet was neither disciplined nor disciplined so severely. Williams v. Akron, 9th Dist. No. 21306, 2003-Ohio-7197, at ¶ 13, citing Clayton v. Meijer, Inc.
(C.A.6, 2002), 281 F.3d 605, citing McDonnell Douglas, 411 U.S. at 804. The defendants asserted in their motion for summary judgment that there was no evidence that Dr. Crane "engaged in the same questionable conduct that plagued Dr. Lindsay, and which resulted *Page 21 
in her job loss." In her memorandum in opposition to the defendants' motion for summary judgment, Dr. Lindsay argues that Dr. Crane engaged in similar conduct but was not disciplined or terminated for such conduct. She references only two examples of such conduct.
 {¶ 46} First, she asserted that Dr. Crane was "known to exhibit short-tempered behavior toward staff[.]" Dr. Jenison testified during deposition that nurses have reported to him that Dr. Crane is somewhat temperamental. He testified that he handled the situation by trying to help those nurses understand Dr. Crane's considerations in the workplace. He further testified that he spoke with Dr. Crane regarding the nurses' concerns. He did not testify that he told Dr. Lavin about any such issues involving Dr. Crane. Dr. Lavin averred in an affidavit that "Dr. Lindsay apparently believes that Stephen Crane, M.D. ("Dr. Crane") treated the staff unprofessionally. I have no knowledge that Dr. Crane engaged in unprofessional treatment of the staff." Dr. Lavin, as Chief of the MFMD, was the physician charged with addressing performance and professionalism issues with the other perinatologists. There is no evidence that any problematic conduct by Dr. Crane was ever brought to Dr. Lavin's attention, so that he could address it.
 {¶ 47} Second, Dr. Lindsay asserted that "Dr. Crane failed to respond in a timely manner when paged to take over for Dr. Lindsay with the delivery of the high-risk patient while on-call (Lindsay Dep. At pp. 424-427)." A thorough review of the record indicates that pages 424-427 of Dr. Lindsay's deposition were not filed in the trial court and are, therefore, not part of the record before this Court. The defendants filed excerpts of Dr. Lindsay's deposition, which did not include those pages. Dr. Lindsay filed only the first day of her deposition testimony, which included pages 1-321. The defendants filed additional excerpts from Dr. Lindsay's deposition in support of their reply memorandum, again without pages 424-427. Accordingly, Dr. Lindsay's assertion of Dr. Crane's conduct is unsubstantiated by the record, as argued by the defendants. *Page 22 
Because Dr. Lindsay pointed to no evidence in the record that Dr. Crane engaged in similar conduct, he was not similarly-situated to Dr. Lindsay in any relevant aspect. See, generally, Williams, supra.
 {¶ 48} Because Dr. Lindsay has failed to meet her reciprocal burden by presenting any evidence that the other three perinatologists in the MFMD were similarly situated to her, she has failed to satisfy the fourth prong of the McDonnell Douglas analysis and, therefore failed to set forth a prima facie case of gender or racial discrimination. Accordingly, the trial court did not err by granting summary judgment in favor of the defendants on Dr. Lindsay's discrimination claims. Dr. Lindsay's second assignment of error is overruled.
Breach of Contract {¶ 49} Dr. Lindsay alleged in her amended complaint that the defendants breached the terms of her employment agreement by failing to honor the part-time work provisions therein and by terminating her employment after less than one year in violation of the notice and termination provisions contained therein. In their motion for summary judgment, the defendants argued that Dr. Lindsay was entitled to only thirty days notice of termination, rather than one year, because she was terminated for cause, rather than without cause. As the allegation regarding the failure to honor her part-time status necessarily implicates issues regarding her termination pursuant to the contract, this Court will address the breach of contract issue within that context.
 {¶ 50} To prevail on her claim alleging breach of contract, Dr. Lindsay must prove "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." Kunkle v. Akron Mgt. Corp., 9th Dist. No. 22511,2005-Ohio-5185, at ¶ 18, quoting Doner v. Snapp (1994),98 Ohio App.3d 597, 600. *Page 23 
 {¶ 51} Dr. Lindsay was hired for a five-year term from June 20, 2005, through June 19, 2010, subject to earlier termination under certain limited circumstances. Section 5(b) of the employment agreement provided for automatic termination upon Dr. Lindsay's death or conviction of a felony or misdemeanor related to the provision of or payment for health care services. Section 5(b) further provided for termination without cause upon either Dr. Lindsay's or Children's one-year prior written notice to the other. Finally, Section 5(b) provided for Dr. Lindsay's termination for cause under various circumstances upon written notice and subject to a thirty-day cure period.
 {¶ 52} By letter dated April 5, 2006, and signed by Dr. Lavin and Lisa Aurilio, Dr. Lindsay was notified of continued complaints regarding her clinical performance and professional conduct. The letter delineated eleven specific areas requiring her "continued performance improvement[.]" The last paragraph of the letter read as follows:
 "This letter will inform you that your performance in these areas must show marked improvement. This letter should be considered notification of your one year prior written notice for termination of your contact [sic] unless marked improvement is noted in your performance. The period of notice may be reduced to 30 days if there is not marked improvement in your performance."
Following Dr. Lindsay's failure to report to work as scheduled on April 21, 2006, Dr. Lavin caused to be sent to Dr. Lindsay by certified mail a letter dated May 1, 2006, terminating her employment, effective at the end of business on Friday, May 5, 2006. The letter indicated that Dr. Lindsay was being terminated for cause based on her performance issues. Dr. Lavin's letter served to terminate Dr. Lindsay's employment thirty days after the April 5, 2006 letter purporting to give her notice of the need to improve her performance.
 {¶ 53} On its face, the May 1, 2006 termination letter does not comply with the termination provision regarding termination without cause because Dr. Lindsay was terminated *Page 24 
long before the passing of one year. The defendants argue, however, that the April 5, 2006 letter gave appropriate written notice of termination for cause because it included a thirty-day cure period. By its plain language, however, the April 5, 2006 letter does not give a definitive thirty-day notice of termination. Rather, it merely indicates that, if Dr. Lindsay failed to show marked improvement in her performance, a thirty-day notice of impending termination might be forthcoming. The defendants' evidence attached in support of their motion for summary judgment further dispels this argument.
 {¶ 54} Lisa Aurilio, who signed the April 5, 2006 letter, testified during her deposition that the letter gave Dr. Lindsay one year's notice of termination, and merely that the notice period could be reduced to 30 days in the absence of marked improvement in her performance. Counsel inquired, "But at that point was she being given notice of termination of her employment in 30 days?" Ms. Aurilio testified, "No." Accordingly, a representative of the hospital itself admitted that the April 5, 2006 letter did not properly convey a thirty-day notice of termination. Under these circumstances, the defendants failed to meet their initialDresher burden to show that no genuine issue of material fact existed in regard to the breach of contract claim alleging that the defendants terminated her in violation of the termination provisions in her employment agreement.
 {¶ 55} The defendants presented evidence to show that Dr. Lindsay was given one year's notice of her termination without cause. The defendants failed, however, to present evidence to show that she was then only terminated after the year elapsed. In addition, the defendants failed to present evidence that Dr. Lindsay was given thirty days' notice of her impending termination unless she cured the deficiencies substantiating a termination for cause in the interim. Accordingly, the defendants failed to present evidence to show that no genuine issues of material *Page 25 
fact existed and that they were entitled to judgment as a matter of law on Dr. Lindsay's breach of contract claim. Therefore, the trial court erred by granting summary judgment in favor of the defendants on the breach of contract claim. Dr. Lindsay's third assignment of error is sustained.
 III. {¶ 56} Dr. Lindsay's first and second assignments of error are overruled. Her third assignment of error is sustained. The judgment of the Summit County Court of Common Pleas is affirmed, in part, reversed, in part, and remanded for further proceedings consistent with this decision.
Judgment affirmed, in part, reversed, in part, and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30. *Page 26 
Costs taxed equally to both parties.
DONNA J. CARR FOR THE COURT
WHITMORE, J. CONCURS