[Cite as *Meyers v. Goodrich Corp.*, 2011-Ohio-3261.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
No. 95996

---

## SCOTT MEYERS

PLAINTIFF-APPELLANT

vs.

## GOODRICH CORPORATION, ET AL.

DEFENDANTS-APPELLEES

---

## JUDGMENT:
## AFFIRMED

---

Civil Appeal from the
Cuyahoga County Common Pleas Court
Case No. CV-676723

**BEFORE:** Boyle, P.J., Cooney, J., and E. Gallagher, J.

**RELEASED AND JOURNALIZED:**    June 30, 2011

**ATTORNEYS FOR APPELLANT**

Avery S. Friedman
Patrick R. Kramer
Avery Friedman & Associates
701 City Club Building
850 Euclid Avenue
Cleveland, Ohio    44114-3358

**ATTORNEYS FOR APPELLEES**

Susan C. Hastings
Ryan A. Sobel
Squire, Sanders & Dempsey LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio    44114-1304

MARY J. BOYLE, P.J.:

{¶ 1}   Plaintiff-appellant, Scott Meyers, appeals the trial court's decision granting summary judgment to defendants-appellees, Goodrich Corporation and Arlon Stringer, Meyers's direct supervisor, on Meyers's retaliation claim.   In Meyers's sole assignment of error, he argues that the trial court erred in doing so.   Finding no merit to the appeal, we affirm.

Procedural History and Factual Background

{¶ 2}  Meyers began working as a production supervisor for Goodrich in January 2001, in the weld cell department of the landing gear division.  Meyers was an at-will employee, supervising between 30 and 50 hourly employees.

{¶ 3}  In January 2007, Angela Winter, vice-president of human resources, interviewed Meyers as part of an internal investigation into allegations of racial discrimination by another employee.

{¶ 4}  Meyers was notified in January 2008 by Stringer, Thomas Rohlfs, site director of the Cleveland plant, and Bob Buchanan, director of human resources (who directly reported to Winter), that Goodrich was terminating his employment.

{¶ 5}  Meyers initially brought an age discrimination action against Goodrich and Stringer in March 2008.  But he later voluntarily dismissed that complaint and refiled in November 2008, this time asserting a retaliation claim, as well as an age discrimination claim.

{¶ 6}  After discovery was completed, Goodrich moved for summary judgment on both counts, which Meyers opposed.  The trial court granted Goodrich's motion on the retaliation claim, but denied it as to the age discrimination claim.

{¶ 7}  With respect to retaliation, the trial court determined that Meyers had not established a prima facie case of retaliation because (1) the decision-makers who terminated

Meyers did not know that he had taken part in a protected activity, and (2) "the fact that a year elapsed" between the protected activity and plaintiff's termination "mitigate[d] against a finding of retaliation."

{¶ 8} Meyers subsequently amended his complaint to remove his age discrimination claim and filed notice of appeal regarding his retaliation claim.

## Summary Judgment

{¶ 9} An appellate court reviews a decision granting summary judgment on a de novo basis. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 1996-Ohio-336, 671 N.E.2d 241. Summary judgment is properly granted when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and, (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made. Civ.R. 56(C); *State ex rel. Duganitz v. Ohio Adult Parole Auth.*, 77 Ohio St.3d 190, 191, 1996-Ohio-326, 672 N.E.2d 654.

## Retaliation Claim

{¶ 10} Title VII of the Civil Rights Act, as well as the Ohio Civil Rights Act, R.C. 4112.02 et seq., forbid retaliation by employers against employees who report workplace discrimination. *Crawford v. Metro. Govt. of Nashville & Davidson Cty., Tenn.* (2009), 55

U.S. 271, 129 S.Ct. 846, 849, 172 L.Ed.2d 650. The United States Supreme Court explained the public policy reasons behind laws protecting employees from retaliation:

{¶ 11} "If it were clear law that an employee who reported discrimination in answering an employer's questions could be penalized with no remedy, prudent employees would have a good reason to keep quiet about Title VII offenses against themselves or against others. This is no imaginary horrible given the documented indications that '[f]ear of retaliation is the leading reason why people stay silent instead of voicing their concerns about bias and discrimination.'" Id. at 852, quoting Brake, Retaliation (2005), 90 Minn. L.Rev. 18, 20.

{¶ 12} R.C. 4112.02(I) provides that it is "an unlawful discriminatory practice *** [f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code."

{¶ 13} To establish a prima facie claim of retaliation under R.C. 4112.02(I), a plaintiff has to show that: (1) he or she engaged in a protected activity; (2) his or her employer knew of his participation in the protected activity; (3) he or she suffered an adverse employment

action; and (4) a causal link existed between the protected activity and the adverse action. *Wille v. Hunkar Laboratories, Inc.* (1998), 132 Ohio App.3d 92, 107-108, 724 N.E.2d 492.

{¶ 14} If the plaintiff establishes a prima facie case, then the burden shifts to the employer, who must then articulate a legitimate, nondiscriminatory reason for taking the adverse action. *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668. If the employer does so, then the burden shifts back to the plaintiff to show that the employer's proffered reason was a mere pretext to mask its true retaliatory intent. *Texas Dept. of Community Affairs v. Burdine* (1981), 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207.

<u>Prima Facie Case</u>

1. <u>Protected Activity</u>

{¶ 15} Title VII's anti-retaliation provision, as well as Ohio's, makes it unlawful for an employer to discriminate against its employee (1) because the employee opposed an unlawful employment practice (the "opposition clause"); or (2) because the employee "made a charge, testified, assisted, or participated in any manner in any investigation" involving discrimination (the "participation clause"). R.C. 4112.02(I); 42 U.S.C. 2000e-3(a).

{¶ 16} Goodrich argues that Meyers did not engage in a protected activity because he did not sufficiently "oppose" an unlawful discriminatory practice as set forth in *Crawford*, 555 U.S. 271. The United States Supreme Court explained that the ordinary meaning of

"oppose" is "'to resist or antagonize ***; to contend against; to confront; resist; withstand,'" or "'to be hostile or adverse to, as in opinion.'" *Crawford* at 850, quoting Webster's New International Dictionary (2 Ed.1958) 1710 and Random House Dictionary of the English Language (2 Ed.1987) 1359. The *Crawford* court further, quoting from an "EEOC guideline," explained: "'When an employee communicates to her employer a belief that the employer has engaged in *** a form of employment discrimination, that communication' virtually always 'constitutes the employee's *opposition* to the activity.'" (Emphasis sic.) Id. at 851.

**{¶ 17}** Meyers testified in his deposition that in January 2007, Angela Winter, vice-president of human resources, interviewed him as part of a "discrimination and ethics case" involving Mark Burden against a supervisor, Michael Manfredonia. Meyers stated: "Angie Winter initially started talking about the racial connotation of some things going on at work. She talked about certain instances of racial discrimination had been brought up, asked me if I was aware of it. And I had to say that I had been because certain members of the Goodrich team of color had been treated differently than someone not of color due to the instance I just related."

**{¶ 18}** The "instance" Meyers "just related" to Winter involving racial discrimination, indeed the *only* "instance" Meyers shared with Winter, involved a white employee, Mike

Hammer, receiving preferential treatment from Manfredonia because Hammer purportedly worked on Manfredonia's car, not because he was white. Moreover, if Hammer received preferential treatment because he worked privately on Manfredonia's car, then Hammer received preferential treatment over all of Manfredonia's direct reports (employees who reported directly to him), including white ones, not just Burden.

{¶ 19} When asked in his deposition, "So other than the relationship between Mr. Manfredonia and Mr. Hammer, did you share any other factual information with Angie Winter that you believed was related to either race discrimination or ethics," Meyers responded "no." When further asked in his deposition: "[d]id you have any other conversation with Angie Winter related to this investigation," Meyers replied that he had. Meyers stated, "I talked about how the discrimination went sometimes deeper than black and white. It went deeper than black and white into how some supervisors were treated in a more favorable fashion than other supervisors *** based on their years of service."

{¶ 20} Based on Meyers's testimony in his deposition, he did not tell Angie Winter of any instance of racial discrimination. Thus, he did not "oppose" racial discrimination in the investigation that amounted to his taking part in a protected activity under the first clause of R.C. 4112.02(I), the "opposition clause."

**{¶ 21}** Nonetheless, Meyers "*participated in*" what *began* as a racial discrimination investigation. Angie Winter testified that she began investigating a complaint that Goodrich received anonymously on its hotline alleging that Burden was being racially discriminated against by Manfredonia. Meyers agreed to, and did, talk to Winter about what he had observed. Thus, under the second clause of R.C. 4112.02(I), the "participation clause," Meyers met the first element of a prima facie case, i.e., that he took part in a protected activity.

2. Employer's Knowledge

**{¶ 22}** To be liable for retaliating against an employee for taking part in a protected activity, the employer must have knowledge of it. "Knowledge may be inferred from evidence in the record. See, e.g., *Proffitt v. Metro. Govt. of Nashville and Davidson Cty., Tenn.* (C.A.6, 2005), 150 Fed.Appx. 439, 442-43 (stating that direct evidence of knowledge not required, and a plaintiff 'may survive summary judgment by producing circumstantial evidence to establish this element of her claim')." *Scott v. Eastman Chem. Co.* (C.A.6, 2009), 275 Fed.Appx. 466, 482. Although circumstantial evidence of knowledge is sufficient to survive summary judgment, it is not enough for an employee to simply make general allegations that "decisionmakers generally have knowledge of charges filed by employees." Id.

{¶ 23} Goodrich argues that it is undisputed that the three people who decided to terminate Meyers, namely, Stringer, Rohlfs, and Buchanan, did not know that Winter had interviewed Meyers. While it is true that Rohlfs and Stringer testified in their depositions that they were not aware of Meyers's involvement in Winter's investigation, Buchanan's involvement was not as clear.

{¶ 24} Buchanan agreed that he recalled an incident where "there was a complaint of discrimination or harassment and Mr. Meyers was involved as a witness." When asked to further explain, Buchanan stated, "I had investigated a situation, and if I can recall, I think that Mr. Meyers — in fact, I know Mr. Meyers was named as a person that we should talk to." Buchanan testified that the "situation" involved a racial complaint that was raised by Burden against Manfredonia. When asked if he or Winter spoke to Meyers regarding that complaint, Buchanan could not recall. But Buchanan did recall interviewing Christine Anderson, Don Wallace, and Maxy Scott about the allegations.

{¶ 25} Based on this evidence, we disagree with the trial court that Meyers did not establish that there was — at least — a question of fact as to whether one of the three decision-makers, namely, Buchanan, knew that Meyers took part in the investigation.

**{¶ 26}** Thus, we conclude that for purposes of summary judgment, Meyers raised genuine issues of material fact as to the second element of a prima facie case of retaliation, i.e., the employer's knowledge.

3. Adverse Action

**{¶ 27}** Because he was terminated, Meyers easily meets this element.

4. Causal Connection

**{¶ 28}** A causal connection is shown through direct evidence or through knowledge coupled with a closeness in time that creates an inference of causation. *Nguyen v. Cleveland* (C.A.6, 2000), 229 F.3d 559, 566. Close temporal proximity between the employer's knowledge of the protected activity and the adverse employment action alone may be significant enough to constitute evidence of a causal connection — but only if the adverse employment action occurs "very close" in time after an employee learns of a protected activity. *Clark Cty. Sch. Dist. v. Breeden* (2001), 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509; *Mickey v. Zeidler Tool & Die Co.* (C.A.6, 2008), 516 F.3d 516, 525 (employee was fired on the day his employer learned that he had filed an EEOC complaint).

**{¶ 29}** On the other hand, where some time elapses between the protected activity and the subsequent adverse employment action, the employee must produce other evidence of retaliatory conduct, namely, evidence of additional discrimination, to establish causation.

*Mickey* at 525; see, also, *Hall v. Banc One Mgt. Corp.*, 10th Dist. No. 04AP-905, 2006-Ohio-913, ¶47 (interval of two months between complaint and adverse action "so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in [plaintiff's] favor on the matter of causal link"), reversed on other grounds by 114 Ohio St.3d 484, 2007-Ohio-4640, 873 N.E.2d 290; *Ningard v. Shin Etsu Silicones*, 9th Dist. No. 24524, 2009-Ohio-3171, ¶17 (holding that mere temporal proximity does not suffice, "especially where the events are separated by more than a few days or weeks").

{¶ 30} In this case, no inference of causation can be deduced from "temporal proximity." Goodrich did not terminate Meyers until a year after he participated in the internal discrimination investigation. Thus, to survive summary judgment, Meyers was required to submit additional evidence of retaliatory conduct — or discriminatory intent — between the time he took part in the protected activity and the time he was fired. See *Hall*, 2006-Ohio-913, ¶47; *Ford v. Gen. Motors Corp.* (C.A.6, 2002), 305 F.3d 545, 552-553. Evidence that an employer treated the employee differently from similarly-situated employees is relevant to this analysis. *Nguyen*, 229 F.3d at 563, citing *Moon v. Transp. Drivers, Inc.* (C.A.6, 1987), 836 F.2d 226, 230.

{¶ 31} In *Parries v. Makino, Inc.* (C.A.6, 2005), 148 Fed.Appx. 291, the employee was initially terminated in November 1999. He subsequently filed a complaint with the Ohio Civil Rights Commission, challenging his termination. An arbitrator issued a decision in his favor and ordered that he be reinstated in August 2000. He was terminated again in June 2001. He filed several claims against his employer, including a retaliation claim.

{¶ 32} The *Parries* court held that although the employee was not terminated until almost a year after he was reinstated, the "retaliatory behavior against [him] began almost immediately after his reinstatement." Id. at 301. The court found that the employee was "subjected to excessive scrutiny of his conduct," including "more frequent disciplinary writeups *** for trivial matters" than other Makino employees. Id. The evidence further suggested that his supervisor increased his workload, assigning him a disproportionately high number of difficult jobs. There was also evidence that in a letter from the employee's supervisor requesting that the employee be terminated, the supervisor complained of the employee's "history of filing grievances as problematic behavior." Id. at 302. The *Parries* court concluded that the employee met his burden of establishing a causal link sufficient to meet a prima facie case of retaliation. Id.

{¶ 33} Here, there is no such record establishing a causal link between the time Meyers was interviewed by Winter, in January 2007, and the time he was terminated, in

January 2008. There is simply no evidence in the record of retaliatory or discriminatory conduct within that relevant time frame.

**{¶ 34}** There is evidence that sometime before October 2006, Goodrich managers met to discuss how to improve the overall performance of its employees, including supervisors. They ranked 26 supervisors based on five criteria: (1) leadership/teamwork; (2) communications; (3) functional/technical; (4) performance management; and (5) planning/adaptability. The managers ranked Meyers the 24th lowest-performing production supervisor out of 26 supervisors. James LeSeure, Meyers's manager at that time, sent Meyers a letter on October 26, 2006, notifying him that he had 30 days to improve and maintain his performance in certain areas, which were outlined in the letter. But notably, this occurred three months *before* Meyers took park in the internal investigation.

**{¶ 35}** Even according to Meyers, after January 2007 when the protected activity occurred, the evidence indicates that Goodrich's conduct — if anything — was favorable to him, not retaliatory. He received a 3.5 percent merit raise in April 2007, where he asserts he "was in line with the raises of several of his fellow supervisors." The record establishes that three other employees received a 3.5 percent merit raise, while one received a lower percentage and three received a higher one. Meyers further testified in his deposition that in the summer of 2007, he believed he "had a pretty good relationship" with Stringer, his direct

supervisor, and Rohlfs, Stringer's supervisor. He also felt that his previous manager, J.K. LeSeure, who supervised him until April 2007, "appreciated the job that I was doing for him."

{¶ 36} As Meyers concluded in his appellate brief, "[t]he record is simply devoid of any evidence" that Goodrich treated him badly in 2007 (of which this court could infer that there was a question of fact that Goodrich retaliated against him in the relevant time period), i.e., "[n]o write-ups, no disciplinary actions, no poor reviews."

{¶ 37} Thus, we conclude that Meyers did not present any evidence of a causal link between the protected activity and his termination.

{¶ 38} Indeed, Meyers testified in his deposition that when he was terminated, Rohlfs had said to him that Goodrich was letting him go because they wanted to "upgrade their talent." Rohlfs, Stringer, and Buchanan testified to the same thing. When making the decision to terminate Meyers, all three testified that they relied, in part, on the October 2006 rankings. Meyers contends that those rankings were irrelevant because he improved his performance, as evidenced by the January 2007 letter from Stringer, stating that he had met the 30-day challenge. But even if Meyers improved his overall performance in those 30 days, it does not mean he had the qualities Goodrich was looking for to upgrade its talent for the future.

**{¶ 39}** Accordingly, we agree with the trial court that Meyers failed to establish a prima facie case of retaliation and, therefore, summary judgment for Goodrich was warranted.

Judgment affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

MARY J. BOYLE, PRESIDING JUDGE

COLLEEN CONWAY COONEY, J., and
EILEEN A. GALLAGHER, J., CONCUR