[Cite as *Whitney v. J.M. Smucker Co.*, 2025-Ohio-2141.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

JENNIFER WHITNEY

    Appellant

    v.

J.M. SMUCKER COMPANY, et al.

    Appellees

C.A. Nos.    30713
               30714

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CV-2020-11-3164

DECISION AND JOURNAL ENTRY

Dated: June 18, 2025

---

HENSAL, Judge.

**{¶1}** Jennifer Whitney appeals an order of the Summit County Court of Common Pleas that granted summary judgment to the J.M. Smucker Company ("JMS") on her retaliation claim and an order that placed its decision under seal. For the following reasons, this Court affirms.

I.

**{¶2}** Ms. Whitney worked as an in-house attorney for JMS on employment law issues and eventually became vice president of employee relations. In August 2019, an employee who had been terminated from the company's information services (IS) department sued the company for sex discrimination. JMS hired outside counsel to defend the lawsuit. One of counsel's requests was for the employee relations department to prepare a summary of all the employees who had left the IS department over the past couple of years, which it did.

**{¶3}** In June 2020, the spouse of a former IS employee sent JMS a letter, alleging there was discrimination occurring within the IS department. JMS hired different outside counsel to

investigate the allegation. As outside counsel for the investigation began to request documents, Ms. Whitney expressed concern about producing documents associated with the lawsuit because she was concerned about waiving attorney-client privilege. Following company meetings, she believed there was consensus that outside counsel for the lawsuit should control the release of those documents, and so she did not provide the IS summary to outside counsel for the investigation. A search of employee email accounts that was performed by a JMS paralegal, however, uncovered the IS summary and it was provided to outside counsel for the investigation. That counsel later questioned Ms. Whitney about why she had not produced the IS summary in response to its document requests.

{¶4} Ms. Whitney, meanwhile, raised concerns about the tactics JMS's compliance department used to perform its investigations. An investigation into her concerns was performed by JMS's chief executive officer ("CEO") and chief financial officer ("CFO"), who interviewed Ms. Whitney and several other employees.

{¶5} Both outside counsel's investigation into IS and the CEO's and CFO's investigation into the compliance department concluded around the same time. Based on the investigation he and the CFO did into the compliance department issues, JMS's CEO initially determined that there was no reason to terminate Ms. Whitney, but he did fire the head of the compliance department. After receiving outside counsel for the investigation's assessment that Ms. Whitney was not justified in withholding the IS summary and that there were no attorney-client privilege concerns that would have prevented it from being disclosed, as well as some additional information from JMS's chief legal officer, however, the CEO decided to terminate Ms. Whitney. His decision was challenged by others within the company, but he proceeded with it, in part to ensure that the chief legal officer would not resign.

**{¶6}** The CEO gave three reasons for Ms. Whitney's termination. First, he wrote that the employee relations department was going to be reorganized and her position would be eliminated. Second, he wrote that Ms. Whitney had performance-related issues. Third, he wrote that Ms. Whitney exercised poor judgment when she did not consult with the chief legal officer about whether to release documents to outside counsel for the investigation.

**{¶7}** Ms. Whitney filed a complaint against JMS, alleging retaliation in violation of Ohio Revised Code Section 4112.02. She alleged she had been terminated by opposing conduct that she reasonably believed was in violation of the company's anti-discrimination policies and for her participation in investigations into allegations of unlawful employment practices. The trial court granted summary judgment to JMS, however, concluding that there was no direct or circumstantial evidence of unlawful retaliation. Regarding an allegation by Ms. Whitney that the chief legal officer, who also oversaw the compliance department, wanted her terminated, the court concluded that there was no evidence that the chief legal officer knew Ms. Whitney had accused her of engaging in unlawful discriminatory practices or that the chief legal officer's disclosure of unfavorable information about Ms. Whitney was the but-for cause of Ms. Whitney's termination. The court also ordered its decision to be filed under seal. Ms. Whitney has appealed, assigning five errors.

II.

ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED BY OVERLOOKING, WEIGHING AND/OR FAILING TO CREDIT EVIDENCE IN CONCLUDING THAT THERE WAS NO DIRECT EVIDENCE OF RETALIATION.

{¶8} In her first assignment of error, Ms. Whitney argues that the trial court incorrectly granted summary judgment to JMS because it overlooked evidence of direct retaliation by the company. Under Rule 56(C), summary judgment is appropriate if:

> [n]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977). To succeed on a motion for summary judgment, the party moving for summary judgment must first be able to point to evidentiary materials that demonstrate there is no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law. *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). If the movant satisfies this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 293, quoting Civ.R. 56(E). This Court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). This Court will affirm if there is reason to grant summary judgment, even if it does not agree with the trial court's rationale. *Cosner v. Babcock & Wilcox Co.*, 92 Ohio App.3d 603, 604 (9th Dist. 1993).

{¶9} In relevant part, Section 4112.02(I) prohibits any person from discriminating "in any manner against any other person because that person has opposed any unlawful discriminatory practice . . . ." "To establish a case of retaliation, a claimant must prove that (1) she engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action." *Greer-Burger v. Temesi*, 2007-Ohio-6442, ¶ 13.

{¶10} Regarding whether Ms. Whitney engaged in a protected activity, she argues that she engaged in protected activity when she opposed "unlawful investigatory tactics" that were being employed by the compliance department. In its motion for summary judgment, JMS argued that language was too vague to constitute protected activity. "It is well established that a vague charge of discrimination is insufficient to constitute opposition to an unlawful employment practice for purposes of a claim of retaliation in employment." *Sullivan v. IKEA*, 2020-Ohio-6661, ¶ 27 (12th Dist.). In addition, "[a] mere assertion of a grievance, not based upon opposition to discrimination, does not constitute protected activity." *Ksiazek v. Columbiana Cty. Port Auth.*, 2021-Ohio-1267, ¶ 73 (7th Dist.). In *Pintagro v. Sagamore Hills Township*, 2012-Ohio-2284 (9th Dist.), this Court explained that, for a plaintiff to establish that she engaged in a protected activity, she must "demonstrate that she 'opposed an[ ] unlawful discriminatory practice' such as harassment because of her 'race, color, religion, sex, military status, national origin, disability, age, or ancestry . . . .'" (Alterations in original.) *Id*. at ¶ 13, quoting R.C. 4112.01(A)(8). We rejected the argument that "a report of workplace harassment [is] a legally protected activity no matter what the reason was for the harassment. *Id*. at ¶ 14.

{¶11} In her complaint, Ms. Whitney alleged that the compliance department engaged in inappropriate tactics during investigations such as shaming victims, silencing members of the employee relations team for trying to ensure objectivity, and rushing to judgment. She alleged those tactics had a chilling effect that discouraged employees from reporting their concerns of unlawful discrimination and harassment, and that the compliance department's actions served to perpetuate violations of employment law. She alleged that she brought her concerns to the attention of JMS's chief people officer ("CPO"), but no corrective action was taken, and she experienced increased hostility from the head of the compliance department and JMS's chief legal

officer. She also alleged that she later told the CPO that she thought the compliance department had violated the company's anti-discrimination and harassment policies. This included highlighting to the CPO an investigation where she thought the head of the compliance department and the chief legal officer had deviated from established company practices.

{¶12} In her opposition to JMS' motion for summary judgment, Ms. Whitney asserted in her statement of facts that she expressed concerns that members of the compliance department had engaged in unlawful investigatory techniques. She stated that they had shamed victims, disclosed the identity of an employee who engaged in protected activity beyond those who needed to know, and engaged in retaliation. To support her statement, she pointed to excerpts from her deposition. One excerpt discussed the investigation of C.M. Ms. Whitney believed the compliance department used unlawful investigatory techniques that caused the employee who had reported the discriminatory conduct to express concern about needing to leave the company. In particular, the employee felt shame and regret about coming forward. Ms. Whitney also believed that the chief legal officer retaliated against the employee relations employee who conducted the investigation and compared it to improper conduct that had come to light during the nationwide Me-Too movement.

{¶13} In support of her statement of facts, Ms. Whitney also pointed to excerpts from the deposition of JMS' director of employee relations, who thought the head of the compliance department would sometimes believe someone was guilty before working through the investigatory process and would discipline similar conduct inconsistently. The director also thought the head of the compliance department would shame reporters of misconduct or make them uncomfortable for bringing a concern forward.

{¶14} In her statement of facts, Ms. Whitney also reported telling the chief legal officer about unlawful investigatory practices by the compliance department. She stated that those practices included making conclusions before gathering all perspectives, reaching conclusions without facts, and making decisions based on inaccurate or incomplete facts. She also stated that she had told the chief legal officer that the conduct was causing her legal department team to feel silenced and intimidated.

{¶15} Ms. Whitney further stated that, when the CEO and the CFO began their investigation, she told them about the systemic nature of unlawful investigatory practices by the compliance department. Specifically, she told them that the compliance department failed to timely investigate incidents, made conclusions at the outset without gathering all pertinent facts, rushed to judgment, recommended inconsistent discipline, disclosed the identity of victims, used investigators who lacked subject-matter expertise, and engaged in retaliation.

{¶16} In the argument section of her opposition to the motion for summary judgment, Ms. Whitney argued that she engaged in protected activity when she told the CPO that the compliance team was engaging in unlawful investigatory techniques. Those techniques included victim shaming and improperly disclosing their identities. She also pointed to the observations of the director of employee relations, who had observed behaviors such as assuming guilt and shaming victims, and who had also noted that investigators lacked subject matter expertise. Ms. Whitney argued that the conduct had a chilling effect and that there was a culture of retaliation. She also repeated the concerns that she had made to the CEO and the CFO. Ms. Whitney also argued that JMS's own witnesses believed her complaints qualified as protected activity. Ms. Whitney further argued that she engaged in protected activity when she participated in the internal investigations

conducted by outside counsel and JMS, noting that the investigation by outside counsel was specifically related to an allegation of discrimination.

{¶17} In its decision, the trial court determined there was a genuine issue as to whether Ms. Whitney engaged in protected activity. JMS has not contested whether Ms. Whitney engaged in protected activity on appeal. Accordingly, the next issue is whether JMS was aware that Ms. Whitney engaged in protected activity. JMS, however, did not contest to the trial court that it was aware of her complaints. It also did not challenge that it ended up taking an adverse employment action against Ms. Whitney, which was her termination.

{¶18} Regarding whether there is a causal connection between Ms. Whitney's complaints and her termination, this Court has recognized that "[a] plaintiff may demonstrate a causal connection through direct evidence or 'through knowledge coupled with a closeness in time that creates [an] inference of causation.'" *Healey v. Goodyear Tire & Rubber Co.*, 2012-Ohio-2170, ¶ 19 (9th Dist.), quoting *Meyers v. Goodrich Corp.*, 2011-Ohio-3261, ¶ 28 (8th Dist.). Ms. Whitney's first assignment of error focuses on whether there was direct evidence of a connection. "To establish a direct evidence case, the employee must 'present [ ] evidence, of any nature, to show that an employer more likely than not was motivated by discriminatory intent.'" *Wittman v. Akron*, 2003-Ohio-5617, ¶ 16 (9th Dist.), quoting *Williams v. Time Warner Cable*, 1998 WL 332937, *3 (9th Dist. June 24, 1998).

{¶19} According to Ms. Whitney, the evidence of a direct causal relationship is the CEO's admission that he terminated her based on her conflict with the head of the compliance department and the chief legal officer, the CPO's assessment that her termination was retaliatory, and the Senior Vice President of Human Resources' ("Senior VP") opinion that she could not legitimately explain the CEO's decision. The trial court rejected Ms. Whitney's argument because it required

making too many inferences about what the CEO knew, and because there was no evidence that the CEO told the CPO or Senior VP that he fired Ms. Whitney because of her complaints.

{¶20} Upon review of the record, we agree there is not a genuine issue whether there is direct evidence of a causal connection. "Direct evidence . . . requires no inferences to establish that unlawful retaliation was the reason for the employer's action." *Smith v. Dept. of Pub. Safety*, 2013-Ohio-4210, ¶ 47 (10th Dist.). Ms. Whitney's conflict with the chief legal officer and the head of the compliance department dated back to well before she alleged either of them had engaged in unlawful discriminatory practices. The opinions of the CPO and Senior VP were conjecture and were not based on anything that the CEO had told them directly. Accordingly, we conclude that the trial court correctly determined that there was no direct evidence that Ms. Whitney's engagement in protected activity resulted in her termination. Ms. Whitney's first assignment of error is overruled.

ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED BY OVERLOOKING, WEIGHING AND/OR FAILING TO CREDIT EVIDENCE IN CONCLUDING THAT WHITNEY COULD NOT ESTABLISH HER CLAIMS VIA THE INDIRECT METHOD OF PROOF.

{¶21} In her second assignment of error, Ms. Whitney argues that the trial court incorrectly concluded that she did not establish a causal connection between her protected activity and her termination through indirect proof. "Close temporal proximity between the employer's knowledge of the protected activity and the adverse employment action alone may be significant enough to constitute evidence of a causal connection—but only if the adverse employment action occurs 'very close' in time after an employee learns of a protected activity." *Healey*, 2012-Ohio-2170, at ¶ 19 (9th Dist.), quoting *Meyers*, 2011-Ohio-3261, at ¶ 28 (8th Dist.). "If, however, some time has elapsed between the protected activity and the subsequent adverse employment action,

the employee 'must produce other evidence of retaliatory conduct, namely, evidence of additional discrimination, to establish causation.'" *Id*. at ¶ 20, quoting *Meyers* at ¶ 29. Temporal proximity also does not establish the requisite connection if "the evidence demonstrates intervening performance concerns." *Lindsay v. Children's Hosp. Med. Ctr. of Akron*, 2009-Ohio-1216, ¶ 13 (9th Dist.), quoting *Price v. Marco Tools*, 2007-Ohio-5116, ¶ 39 (9th Dist.).

{¶22} The trial court noted that Ms. Whitney complained to the CPO about the compliance department in the fall of 2019 and to the CEO on August 6, 2020, but was not terminated until September 24, 2020. It, therefore, concluded that there was not a close temporal proximity between the protected activity and alleged retaliatory conduct. It also noted that, between Ms. Whitney's meeting with the CEO and her termination, the CEO completed his investigation and initially concluded that Ms. Whitney should not be terminated. He changed his mind, however, after receiving additional information about the documents Ms. Whitney had withheld from outside counsel for the investigation.

{¶23} Ms. Whitney argues that the timing of her termination is in close enough proximity to her complaints to establish a causal connection between them. She notes that in *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555 (6th Cir. 2004), the Sixth Circuit agreed that a causal connection could be inferred when an employee was terminated three months after filing a discrimination charge. *Id*. at 563. She also argues that she did not rely only on temporal proximity but noted that the CEO identified her conflict with the chief legal officer, who was one of the people her complaints were levied against, as a reason for her termination. She argues that the chief legal officer was the person who initially requested a report from outside legal counsel for the investigation and had the opportunity to edit the report before the CEO reviewed it. The chief legal officer also sent emails to the CEO regarding Ms. Whitney's work in the interim period.

Ms. Whitney also argues that there were errors in the report and that it did not include all relevant background information about the situation.

{¶24} In their initial investigation report, the CEO and the CFO found that Ms. Whitney had a background in litigation but less experience in employment and labor law. They found that she lacked confidence in herself, relied on outside counsel, and tended to rethink issues. Although she could be viewed as waffling on issues, they cited Ms. Whitney's dual role as an employment and employee relations lawyer as contributing to it. They noted that she had withheld documentation from an ongoing investigation and had been reluctant to participate in the investigation. They also found that she resisted the compliance department's approach to issues, preferring to do things the way they had always been done, and that she was reluctant to revisit the employee relations department's processes.

{¶25} In their revised report, the CEO and the CFO repeated their first two findings, but specifically identified Ms. Whitney as indecisive. They found that she was defensive and not collaborative and would seek duplicative and costly opinions from outside counsel without involving the legal or compliance departments. They found Ms. Whitney deliberately excluded the compliance department from meetings and other activities that could promote alignment between the departments. They also found that her withholding of the documentation from the investigation by outside counsel was knowing and found that it was poor judgment to cite client privilege as the reason for withholding documents from company-retained attorneys. Their other new finding was that Ms. Whitney had failed to follow up with employees who had left the company when their exit interviews reported biases within the company and she failed to share those concerns with other company leaders so that they could address the issues proactively.

{¶26}   In his notes for the meeting in which he fired Ms. Whitney, the CEO wrote that he had decided to eliminate Ms. Whitney's position, finding that compliance, employment law, litigation risk management, and employee relations matters had become too interconnected. Instead, legal work would move to the legal department and the employee relations department would focus on advocating for employees and the company's culture with less focus on legal and litigation risks.  He also identified performance concerns with Ms. Whitney's work.  He noted the documentation that was not shared with outside legal counsel and that outside counsel had determined that it hindered their work and extended the investigation.  His notes reflect his finding that, although Ms. Whitney had raised privilege concerns, she should have consulted with the chief legal officer regarding any documents she thought should be withheld.  The CEO also noted that information obtained from Ms. Whitney's emails and interviews with others also indicated that her team showed a lack of collaboration with the compliance department, including times when they had intentionally excluded compliance from an issue even though it would have been appropriate to involve that department.  The notes reflect that the CEO believed that although Ms. Whitney had excelled at many aspects of her role, her inability to collaborate and share necessary information led the CEO to have a lack of confidence in her ability to continue in any of the roles that would exist after the reorganization.

{¶27}   Upon review, we conclude that the trial court did not err when it found that there is no genuine issue of material fact whether there was a causal connection between Ms. Whitney's protected activity and her termination.  Although Ms. Whitney told the CEO about her concerns with the compliance department only a couple of months before her termination, the CEO concluded in his initial report that she should not be terminated.  Only after he received additional information, which did not include any additional allegations from Ms. Whitney, did he decide to

terminate her. As this Court noted in *Lindsay*, temporal proximity does not establish a causal connection if there is evidence of intervening performance concerns. *Lindsay*, 2009-Ohio-1216, at ¶ 13 (9th Dist.). Ms. Whitney's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED BY OVERLOOKING, WEIGHING AND OR FAILING TO CREDIT EVIDENCE IN REJECTING WHITNEY'S CAT'S PAW THEORY OF LIABILITY.

{¶28} In her third assignment of error, Ms. Whitney argues that the trial court incorrectly rejected her cat's paw theory of liability. "A 'cat's paw' is a person used by another to accomplish the other's purposes." *Smith v. Ohio Dept. of Pub. Safety*, 2013-Ohio-4210, ¶ 55 (10th Dist.), citing *EEOC v. BCI Coca–Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir. 2006). Under this theory, even if the person who made an adverse employment decision was unbiased, if a lower-level supervisor had a retaliatory animus, the employer may be held liable. "The plaintiff must show[,]" however, "that the lower-level supervisor's discriminatory animus was a 'but-for' cause of, or a determinative influence on, the unbiased superior's adverse employment decision." *Id*. at ¶ 62. Influence by a lower-level supervisor that was merely a motivating factor to the adverse employment action is insufficient. *Id*. at ¶ 61.

{¶29} Ms. Whitney argues that the trial court failed to recognize evidence in her favor. She argues that the chief legal officer significantly altered the scope of the investigation being carried out by outside counsel, including having it focus on the employee relations department's handling of IS complaints. She argues that the chief legal officer also requested that outside counsel prepare a summary of its findings regarding the employee relations department, that she edited an early draft of the document produced by outside counsel despite having a conflict, and that she failed to disclose her knowledge of the IS summary as well as her participation in

determining how to handle the document. Ms. Whitney also argues that the chief legal officer allowed the employee-relations summary that was generated by outside counsel to include advice that she knew to be wrong. According to Ms. Whitney, if one compares the talking points the CEO prepared before and after receiving the employee-relations report by outside counsel, it establishes that the chief legal officer's manipulation of that document played a critical role in his termination decision.

{¶30} Ms. Whitney alleges that the chief legal officer used the CEO as a cat's paw to terminate her in retaliation for engaging in protected activity. She, therefore, must first establish that the chief legal officer knew she engaged in protected activity. According to Ms. Whitney, there was evidence 1) that the CPO alerted the chief legal officer in writing about her concerns; 2) that the chief legal officer had notes from July 2020 indicating that she was aware that the compliance department had been alleged to have created a hostile work environment and that there was a claim of retaliation against an individual in the compliance department; 3) that she directly addressed her concerns with the chief legal officer; and 4) that the CPO shared her concerns with the chief legal officer, which included concerns of retaliation. We will work through each of those assertions.

{¶31} An email from the CPO to the chief legal officer indicates that the CPO shared work environment concerns that she had heard from the employee relations team. There is nothing in the email that identifies Ms. Whitney as the source of those concerns or that the concerns were related to unlawful discrimination or participation in protected activity.

{¶32} The July 2020 notes by the chief legal officer indicate that the chief legal officer was concerned about ongoing issues between the employee relations and compliance teams. She noted that the head of the compliance department had been accused by the employee relations team

of bullying and creating a hostile work environment. She noted that the head of the compliance department had alleged that Ms. Whitney was creating the difficult working dynamic between the teams. She further noted that she would address the situation and allegations with the CEO and bring them to the Board as part of one of the ongoing investigations. The document does not identify Ms. Whitney as the source of allegations against the compliance department. Although it mentions a hostile work environment, there is nothing that connects it to employees engaging in protected activities. The mention of a claim of retaliation against an individual in the compliance department was merely referring to one of the investigations being conducted by outside counsel.

{¶33} Regarding whether Ms. Whitney directly addressed her concerns with the chief legal officer, Ms. Whitney points to three pages of notes she took of a conversation she had with the chief legal officer. The notes are abridged, use Ms. Whitney's personal shorthand, and identify some individuals only by their initials. The notes indicate that Ms. Whitney raised concerns about how the head of the compliance department treats people. She also expressed concern that she was being ganged up on, not supported by the chief legal officer, and made to feel like the problem. She expressed that she thought the compliance department was reaching conclusions based on incomplete and inaccurate facts and that it was silencing and intimidating her and other members of the employee relations team. The notes also indicate a discussion about the privilege issue and what Ms. Whitney could have done better. There is nothing in the notes related to protected activity.

{¶34} Regarding whether the CPO shared concerns Ms. Whitney had expressed to the CPO with the chief legal officer, Ms. Whitney points to a page of notes by the CPO. Although there is little context to the notes, it appears that the CPO told the chief legal officer several of Ms. Whitney's thoughts about the chief legal officer. They included that Ms. Whitney felt like her

opinion was not sought by the chief legal officer, that she thought the chief legal officer protected the compliance department and forgot that she also reported to the chief legal officer, that the chief legal officer was defensive when she shared concerns, and that the chief legal officer did not get involved in case details and accepted the head of the compliance department's perspective. There is one additional point that says "retaliation 'I've always been an advocate for you' when sharing [illegible] w/ Jen[.]" It is not clear what "retaliation" the note is referencing, or that it is connected to protected activity by Ms. Whitney.

{¶35} Ms. Whitney also argues that, following these communications, the chief legal officer was not in a good place, was "pissed off[,]" and wanted her to be terminated. She argues that, taken together, there is a genuine issue of material fact whether the chief legal officer knew about Ms. Whitney's protected activities.

{¶36} Upon review of the record, construing the evidence most strongly in Ms. Whitney's favor, we conclude that the evidence that Ms. Whitney points to does not create a genuine issue of material fact regarding whether the chief legal officer knew Ms. Whitney had engaged in protected activity. There is no mention of unlawful discrimination or Ms. Whitney's participation in a protected activity in any of the documents. We, therefore, conclude that the trial court did not err when it determined that Ms. Whitney could not establish that retaliation by the chief legal officer for engaging in a protected activity was a determinative influence on the CEO's decision to terminate her. Accordingly, the court correctly determined that Ms. Whitney's action could not move forward under her cat's paw theory of liability. Ms. Whitney's third assignment of error is overruled.

ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED BY SEALING "COURT RECORDS," INCLUDING ITS SUMMARY JUDGMENT DECISION, AND THE BRIEFS

AND EVIDENCE UPON WHICH IT WAS BASED, WITHOUT FINDING CLEAR AND CONVINCING EVIDENCE TO OVERCOME THE PRESUMPTION IN FAVOR OF PUBLIC ACCESS.

**{¶37}** In her fourth assignment of error, Ms. Whitney argues that the trial court incorrectly ordered its summary judgment decision to be sealed. She argues that the court failed to consider the factors it was required to analyze under Superintendence Rule 45(E) in determining whether the records should be sealed.

**{¶38}** We must first consider, however, whether this issue may be raised on direct appeal. This Court has recognized that the Rules of Superintendence "are not designed to alter basic substantive rights" and do not have the same standing as the rules governing practice and procedure. *S.C. v. T.H.*, 2020-Ohio-2698, ¶ 5 (9th Dist.), quoting *In re K.G.*, 2010-Ohio-4399, ¶ 11 (9th Dist.). Ordinarily, they are "purely internal housekeeping rules" and "create no rights in individual defendants." *Id.*, quoting *State v. Tamburin*, 145 Ohio App.3d 774, 779 (9th Dist. 2001).

**{¶39}** In addition, Superintendence Rule 47(B) specifies the remedy for a "person aggrieved by the failure of a court . . . to comply with the requirements of [Superintendence Rule 45] . . . ." The rule indicates that an aggrieved person "may pursue an action in mandamus pursuant to Chapter 2731. of the Revised Code." Sup.R. 47(B). Consequently, other districts have concluded that parties may not "challenge the trial court's decision to restrict access to court records . . . on direct appeal . . . ." *State v. Helfrich*, 2019-Ohio-1785, ¶ 106 (5th Dist.); *N.L. v. A.M.*, 2010-Ohio-5834, ¶ 9 (6th Dist.).

**{¶40}** In *S.C.*, this Court determined that Rule 47(B) did not apply, and a direct appeal could proceed when the trial court declined to restrict access to the record, noting that the rule was titled "Denial of Public Access—Remedy." *S.C.* at ¶ 8. In this case, however, the court did restrict

access to the record by sealing many of the documents that had been filed. Accordingly, we conclude that Ms. Whitney's remedy is in mandamus. Sup.R. 47(B). Ms. Whitney's fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR V

THE TRIAL COURT ERRED BY NOT FINDING WAIVER AND COMPELLING PRODUCTION OF DOCUMENTS WITHHELD AS PRIVILEGED WHEN DEFENDANTS RELIED UPON PRIVILEGED DOCUMENTS AND ADVICE OF COUNSEL IN DEFENDING AGAINST WHITNEY'S CLAIMS, INCLUDING AT SUMMARY JUDGMENT.

**{¶41}** In her fifth assignment of error, Ms. Whitney argues that the trial court incorrectly denied her motion to compel the disclosure of certain documents that it considered privileged. She argues that JMS voluntarily waived its privilege as to some of the documents and abused any privilege that might have existed by using privilege as both a sword and shield. She argues that JMS selectively disclosed some privileged documents but withheld other documents on the same subject matter. JMS also allowed its witnesses to testify about subjects it alleged were privileged but withheld drafts of the investigation report prepared by outside counsel. We review discovery matters involving attorney-client privilege de novo. *See Li v. Du*, 2022-Ohio-917, ¶ 7 (9th Dist.).

**{¶42}** The core of Ms. Whitney's argument appears to be that the trial court incorrectly determined that JMS did not waive the attorney-client privilege as to all the documents she requested. The trial court determined that such a waiver would have had to occur under Revised Code Section 2317.02(A)(1). That section provides that an attorney may not testify about a communication made to the attorney by a client without the client's express consent. It also provides that, "if the client voluntarily reveals the substance of attorney-client communications in a nonprivileged context or is deemed by section 2151.421 of the Revised Code to have waived any testimonial privilege under this division, the attorney may be compelled to testify on the same

subject." R.C. 2317.02(A). Thus, the Ohio Supreme Court has held that, if a client voluntarily discloses a communication to a third party, they waive the confidentiality of the communication. *State ex rel. Hicks v. Fraley*, 2021-Ohio-2724, ¶ 15.

{¶43} In its order, the trial court denied Ms. Whitney's motion to compel document numbers 41-42, 77, 92, 94, 103-04, 148, 170, 174, 191, 232, 278-82, 288-93, 301-05, and 307-09 because it determined that the attorney-client privilege attached to the communications and there was no indication that JMS had expressly waived privilege or voluntarily disclosed the content of the communications in a nonprivileged context. It also denied her motion to compel several internal JMS communications and outside-counsel billing records for the same reasons.

{¶44} In her brief, Ms. Whitney argues generally that JMS voluntarily disclosed privileged information to third parties, but she does not identify when JMS did so for any of the specific documents that the trial court determined were privileged. She merely points to a summary of the documents that she sought to compel, to times when JMS invoked privilege during depositions, and to "briefing to the trial court and this Court . . . ." It is Ms. Whitney's burden on appeal to establish that the trial court erred when it denied parts of her motion to compel. *See Simon v. Simon*, 2021-Ohio-1387, ¶ 9 (9th Dist.). Upon review of the record, we conclude that Ms. Whitney has not established that the trial court incorrectly denied her motion to compel in part. Ms. Whitney's fifth assignment of error is overruled.

III.

{¶45} Ms. Whitney's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

STEVENSON, P. J.
CONCURS.

CARR, J.
CONCURRING IN PART, AND DISSENTING IN PART.

{¶46} I respectfully dissent from the majority's judgment with respect to Ms. Whitney's first three assignments of error and concur in judgment only with respect to the majority's resolution of her last two assignments of error.

**{¶47}** With respect to the first three assignments of error, I would conclude that genuine issues of material fact remain, and, therefore, the trial court's grant of summary judgment was inappropriate. Because Ms. Whitney put forth sufficient direct evidence of retaliation, the trial court erred in granting summary judgment in favor of JMS on Ms. Whitney's claim. That evidence included the statements by the CEO, CPO, and Senior VP related to Ms. Whitney's termination, which constituted admissions by a party opponent and thus were admissible because they were statements about a matter within the scope of their employment. Evid.R. 801(D)(2)(d); *Simple v. Walgreen Co.*, 511 F.3d 668, 672 (7th Cir. 2007). "[A] subordinate's [in this case, the plaintiff's] account of an explanation of the supervisor's [] understanding regarding the criteria utilized by management in making decisions on hiring, firing, compensation, and the like is admissible against the employer, regardless of whether the declarant has any involvement in the challenged employment action." *Marra v. Philadelphia Housing Authority*, 497 F.3d 286, 298 (3d Cir. 2007); *see also Williams v. Pharmacia, Inc.*, 137 F.3d 944, 951 (7th Cir. 1998); *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1053 (7th Cir. 1990); *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1090-94 (1st Cir. 1995); *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1215-16 (3d Cir. 1995).

**{¶48}** Viewing those statements in a light most favorable to Ms. Whitney, there was direct evidence that Ms. Whitney's termination was retaliatory. Importantly, there was evidence that both the CPO and Senior VP spoke at length with the CEO after he made the decision to terminate Ms. Whitney and both assisted in drafting the CEO's termination talking points. Thus, both were actively involved in the termination process.

**{¶49}** Likewise, there was sufficient indirect evidence presented such that Ms. Whitney's claim should have survived summary judgment. Notably, the trial court concluded that there remained genuine issues of material fact with respect to the first three elements of the prima facie

case. Nonetheless, the trial court failed to find a causal connection between the protected activity and Ms. Whitney's termination even though the time period between when Ms. Whitney brought her concerns to the CEO and when she was terminated was only a matter of weeks. While it is true that, in between those two events, the CEO initially opted to retain Ms. Whitney, following that decision, there was evidence that the chief legal officer was upset by the decision, sought to have Ms. Whitney terminated, influenced the investigation, and altered a report that ultimately led to the CEO's decision to terminate Ms. Whitney. Thus, the causal connection was not broken by the CEO's initial decision to retain Ms. Whitney. In addition, as mentioned above, the statements by various JMS personnel further supported the retaliatory nature of Ms. Whitney's termination; thus, her argument was not solely based on temporal proximity.

{¶50} Finally, the record supports that there is a genuine issue of material fact with respect to whether the chief legal officer acted as a cat's paw in orchestrating Ms. Whitney's termination. Ms. Whitney was critical of the chief legal officer's Compliance Department and expressed her concerns directly to the chief legal officer as well as the CPO, who also relayed those concerns to the chief legal officer. There was evidence that the chief legal officer wanted Ms. Whitney terminated and that the chief legal officer attempted to influence the CEO's decision concerning whether to terminate Ms. Whitney. There was also evidence that the chief legal officer influenced the scope of the investigation, requested and altered a report, and that the chief legal officer's version of the facts played a role in the CEO's decision to terminate Ms. Whitney.

{¶51} JMS even admits the trial court made contradictory rulings on issues of fact in its decision. Specifically, the trial court concluded that there was no direct evidence of retaliation as inferences were required to be made pertaining to whether the CEO knew of the unlawful investigatory tactics, and yet, at the same time, the trial court concluded that there was

circumstantial evidence of retaliation because there were "ample genuine issues of material fact" concerning whether the CEO was aware of protected activity because Ms. Whitney claimed she told the CEO and CPO about the unlawful investigatory tactics. JMS claims this is mere harmless error, but I am not so sure as it appears the trial court at times failed to construe evidence in the light most favorable to Ms. Whitney, and thereby also, perhaps inadvertently, made inappropriate findings on summary judgment.

**{¶52}** As to the fourth assignment of error, I agree that it is properly overruled. Given that Ms. Whitney has access to the unredacted decision, she has not suffered prejudice from the trial court's order to seal the decision granting summary judgment to JMS.

**{¶53}** With respect to the fifth assignment of error, while I do not agree with the reasoning of the majority, I agree that the trial court did not abuse its discretion in denying Ms. Whitney's motion to compel in part. Accordingly, I concur in judgment only as to Ms. Whitney's last two assignments of error.

APPEARANCES:

SHANNON J. POLK, ANDREW A. KABAT, MARK F. HUMENIK, and DANIEL M. CONNELL, Attorneys at Law, for Appellant.

MARTIN T. WYMER and CARRIE A. VALDEZ, Attorneys at Law, for Appellees.